UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AERO PRODUCTS INTERNATIONAL, INC., a Florida corporation, and ROBERT B. CHAFFEE, an individual, Plaintiffs, v. INTEX RECREATION CORPORATION, a California corporation; QUALITY TRADING, INC., a California corporation; and WAL-MART STORES, INC., a Delaware corporation, Defendants. | No: 02 C 2590<br><br>Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

The Plaintiffs, Aero Products International, Inc. ("Aero") and Robert B. Chaffee, filed suit against the Defendants, Intex Recreation Corporation ("Intex"); Quality Trading, Inc.; and Wal-Mart Stores, Inc. A jury trial was held, and Defendants were found to have willfully infringed Plaintiffs' patent, United States Patent No. 5,367,726 ("the '726 patent"), for a valve used in an inflatable air mattress and for violating Plaintiffs' trademark. Thereafter, an injunction issued on September 15, 2004, preventing Intex from selling any products that: (1) violate the '726 patent and (2) contain certain product numbers.

This matter comes before the Court pursuant to Plaintiffs' Motion for Contempt against Intex, for violation of the September 15, 2004 injunction. In answer to Plaintiffs' motion, Intex admitted that it sold products with the numbers set out in the injunction. The Court, in a

memorandum opinion and order dated December 15, 2004, ordered Intex to cease and desist selling products bearing those numbers and set the matter for a hearing on Plaintiffs' motion to hold Intex in contempt. *Aero Prods. Int'l v. Intex Recreation Corp.*, No. 02 C 2590, 2004 WL 2958688 (N.D. Ill. Dec. 16, 2004). Specifically, Plaintiffs claim Intex is in contempt by violating the injunction by: (1) manufacturing a new mattress that incorporates a valve which infringes the '726 patent and (2) selling products bearing product numbers prohibited by the injunction. Plaintiffs seek a reasonable royalty on sales of the new mattress. Plaintiffs also seek treble damages and attorneys' fees in bringing this contempt motion for these violations; Plaintiffs have already been awarded double patent damages and attorneys' fees in bringing suit for Intex's violation of the '726 patent. *Aero Prods. Int'l v. Intex Recreation Corp.*, No. 02 C 2590, 2004 WL 1696749 (N.D. Ill. July 15, 2004).

## BACKGROUND

To properly consider Plaintiffs' first claim, a limited review of the '726 patent is necessary. Claim 9 of the '726 patent provides:

An inflatable support system, comprising:

    an inflatable body having an interior, an exterior, and inflation input for transfer of air between the interior and the exterior; and

    a one-way valve, disposed between the interior and the inflation input, for controlling the transfer of air, providing a substantially hermetic seal under low pressure conditions, such valve including:

    a circular lip, disposed peripherally in the passageway and protruding radially inward, having a first surface generally facing the interior, defining a valve seat;

2

a flexible circular diaphragm, having an interior surface generally facing the interior and an outer surface facing away from the interior mounted for axial movement in the passageway away from and against the valve seat in respectively open and closed positions of the valve, so that an outer annular region of the outer surface of the diaphragm engages against the valve seat in the closed position; and

a generally circular coupling defining the passageway, the coupling having an open end defining the inflation input and a flared end, contiguous therewith, providing the circular lip, so that the (i) coupling at the open end has a smaller internal diameter than at the flared end and (ii) the diaphragm can be pushed axially to open the valve by reaching into the open end of the coupling.

Claim 12 provides:

An inflatable body comprising:

an inflatable bladder having an interior and an inflation input;

a one-way valve disposed between the interior and the inflation input providing a substantially hermetic seal under low pressure conditions, such valve including:

a passageway having a generally circular cross section and a first end in communication with the interior and a second end in communication with the inflation input;

a circular lip, disposed peripherally in the passageway and protruding radially inward, having a first surface generally facing the interior, defining a valve seat;

a flexible circular diaphragm, having an inner surface generally facing the interior and an outer surface facing away from the interior, mounted for axial movement in the passageway away from and against the valve seat in the respectively open and closed positions of the valve, so that (i) the act of inflation of the bladder under low pressure is sufficient to cause axial motion of the valve into the open position to permit the large influx of air and (ii) following inflation of the bladder, air pressure created in the interior the bladder by inflation thereof causes an outer annular region of the outer surface of the diaphragm to be urged into engagement against the valve seat to provide a complete hermetic seal when the valve is in the closed position; and

stiffening means for reducing flexing of the diaphragm except in its outer annular region.

The Court, before the jury trial, construed the disputed terms of the '726 patent as follows: (1) "the open end" is the end where air used to inflate the air mattress enters the passageway; (2) "the inflation input" is where air enters the passageway; (3) "the generally circular coupling" is a coupling that is generally circular and is formed by an open end that is contiguous with the flared end; (4) "the passageway" is a way that allows passage of air to and from the interior of the bed; (5) "axial movement in the passageway" means that some axial movement of the diaphragm must be possible in the passageway, and the axial movement need not be contained entirely within the passageway; (6) "reaching into the open end of the coupling" means that the diaphragm is able to be pushed axially by reaching one's finger, or another element, into the open end of the coupling; (7) the "circular lip" is a lip that is circular that juts from the surrounding surface towards the interior of the passageway; (8) "protruding radially inward" means that the lip is positioned towards the center of the device in question and remains placed along the whole radius throughout the whole piece; (9) a "substantially hermetic seal" is a seal that is nearly or largely impervious to air; and (10) "complete hermetic seal" means a seal that does not require any additional parts to retain nearly or largely all of the air in the bed. *Aero Prods. Int'l v. Intex Recreation Corp.*, No. 02 C 2590 (Markman Ruling), 2004 WL 407028 (N.D. Ill. Jan. 28, 2004).

## ANALYSIS

*Contempt Proceedings Regarding the "G1" Mattress*

Plaintiffs seek a finding of contempt holding Intex liable for infringing the '726 patent with a product designated as the "G1" mattress. This product, as so identified, was not the subject of the jury trial and verdict for Plaintiffs. According to Plaintiffs, Intex manufactured an

air mattress that incorporates a valve that also infringes the '726 patent because the new valve is materially identical to the accused device at issue in this litigation.

Intex contends Plaintiffs should have raised the issues concerning the G1 valve at trial. According to Intex, Plaintiffs learned of the existence of the new valve in July 2003 and were provided a sample of the G1 valve in the Fall of 2003. Plaintiffs were provided with a sample of an Intex air mattress that used the G1 valve on February 5, 2004. Discovery in this matter closed on September 26, 2003; and the trial began on February 18, 2004. Litigation of this product with the then-pending claims of infringement of the '726 patent would have required additional discovery, trial preparation and, therefore, an extension of the discovery closure date and re-scheduling of the jury trial to a later date. This would have been contrary to the ends of justice and unfair to Plaintiffs, as the case had been filed almost twenty-two months earlier and the trial date had been set for fourteen months. Therefore, Plaintiffs are not barred from proceeding now against Intex on the G1 valve on this basis.

To hold Intex in contempt, the patentee must prove, by clear and convincing evidence, that "the modified device falls within the admitted or adjudicated scope of the claim and is, therefore, an infringement." *Arbek Mfg., Inc. v. Moazzam*, 55 F.3d 1567, 1569 (Fed. Cir. 1995) (*Arbek Mfg.*) (citation omitted). This involves two issues. First, a contempt hearing must be "an appropriate forum in which to determine whether a redesigned device infringes, or whether the issue of infringement should be resolved in a separate infringement action." *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1349 (Fed. Cir. 1998) (*Additive Controls*) (citation omitted). This analysis compares the original infringing product and the redesigned device; if "substantial open issues of infringement" exist with the redesigned device,

5

then contempt proceedings should not be used. *Additive Controls*, 154 F.3d at 1349 (citation omitted). Expert witness testimony may be considered in making this finding. *See Additive Controls*, 154 F.3d at 1349. Second, if contempt proceedings are appropriate, it must be determined whether the redesigned device infringes the patent. *Additive Controls*, 154 F.3d at 1349 (citation omitted).

Intex argues that there are substantial open issues of infringement because the terms "interior" and "exterior," as used in claims 9 and 12 of the '726 patent, have not been construed. Intex also argues that other substantial open issues of infringement exist because (1) the placement of the pump in the G1 design is completely within the mattress, while the pump was not placed inside the mattress in the previous design; (2) the G1 design lacks the passageway structure of the infringing device; (3) the G1 design lacks the coupling structure of the infringing device; (4) the cam structure of the G1 design is completely changed from the design of the infringing mattress; and (5) the stiffener in the G1 valve actually contacts the valve seat to hold the flexible diaphragm in place, whereas, in the infringing valve, the flexible diaphragm held itself in place with no other assistance.

Construing new terms at this stage does not preclude the use of contempt proceedings. "The presence of a new issue, however – **even a new issue of claim construction** – does not necessarily require that a separate infringement action be brought to determine whether the accused device infringes the patent in suit. Contempt proceedings are appropriate as long as the new issue does not raise a substantial question of infringement." *Additive Controls*, 154 F.3d at 1350 (emphasis added).

Plaintiffs argue that the term interior is the region where air is retained when the mattress is inflated. Intex offers no alternative definition with respect to the '726 patent but, instead, offers that the only plausible definition of the term relates to placement of certain parts of the G1 design reside inside or outside of the inflatable body. This analysis, though, is pertinent to whether the G1 device actually infringes the '726 patent and not the construction of the term interior. As such, the ordinary and accustomed meaning of the term interior is best construed as the place where the pressure exists when the inflatable body is inflated. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999) (*K-2*). By extension, the ordinary and accustomed meaning of the term "exterior" is best construed as the place to which inflating air may be drawn or to which air may be released.

The changes made by Intex are not essential to the device and do not involve the claims of the '726 patent. *Additive Controls*, 154 F.3d at 1350. The shape and location of the pump are irrelevant in determining whether the redesigned valve is substantially similar to the old valve, and nothing in the claims implicates the placement of the pump design. A comparison of the G1 valve and the infringing valve reveals they both have similar passageways and generally circular couplings. Furthermore, whether a cam mechanism holds the movable portion of the valve is not relevant; nothing in the claims requires a cam mechanism to be used in any regard with the valve. Finally, nothing in the claims discloses a seating function; moreover, the flexible diaphragm in the G1 valve is held in place against the valve seat to create a seal in the closed position, as is the infringing valve.

Based on the above, Plaintiffs have demonstrated by clear and convincing evidence that no substantial open issues of infringement exist with the redesigned device; therefore, a contempt

proceeding is an appropriate method to determine whether the pump design of the G1 mattress infringes the '726 patent.

It must be determined whether the G1 device infringes claims 9 and 12 of the '726 patent. In making this determination, the claims of the patent are compared to the accused device, and every claim limitation must be present in the accused device. *E.g., Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306, 1313 (Fed. Cir. 2005).

Intex argues that this showing was insufficient because: (1) Plaintiffs have failed to demonstrate the G1 device creates a "substantially hermetic seal"; (2) the location of the "interior," "exterior," and "inflation input" in the G1 device differs from the location of those elements in the '726 patent; (3) the G1 device lacks a circular lip which protrudes radially inward; (4) the diaphragm of the G1 device cannot be pushed axially by reaching into the open end of the coupling; and (5) the sealing and seating functions of the G1 device use a rigid disc, as opposed to a flexible diaphragm.

Plaintiffs presented evidence from tests performed by Dr. Albert Karvelis that the G1 device creates a substantially hermetic seal which is nearly or largely impervious to air. Intex initially contends that this evidence should not be considered because it was not timely performed and included in Plaintiffs' Motion for Contempt. However, Intex received this evidence approximately ten days before the hearing in this matter. At no time did Intex request discovery with regard to this testing or ask to postpone the hearing to depose Dr. Karvelis and examine his data.

Intex also argues that the tests performed, by use of a simulated sleep test and a bubble leak test, were insufficient for a number of reasons. However, the testing procedures and results,

considered in totality, were generally reliable and relevant and provide clear and convincing evidence that the G1 valve was largely or nearly impervious to air. The results of the tests demonstrated that essentially no air leaked from the valve. Intex has failed to present any evidence – through tests, testimony, or otherwise – that demonstrates the G1 valve was not "substantially hermetic."

Intex contends the location of the "interior," "exterior," and "inflation input" in the G1 device differs from the location of those elements in the '726 patent. Intex contends that the location of the interior of the G1 device is the pump housing, the exterior is the inflatable portion of the mattress, and the inflation input corresponds to the control knob on the pump housing which allows the valve to open. However, the only portion of the G1 device which retains air is the mattress itself, except for the limited portion of the mattress containing the pump housing. The place where inflating air may be drawn or where air may be released is the pump housing. The inflation input is the area where air directly enters the valve inside the pump housing. Accordingly, clear and convincing evidence exists that the G1 mattress contains these claim limitations.

Intex contends that the G1 device lacks a circular lip which protrudes radially inward and that the diaphragm of the G1 device cannot be pushed axially by reaching into the open end of the coupling. An examination of the G1 valve reveals, though, that a lip juts out from the surrounding surface towards the interior of the passageway, is positioned towards the center of the device, and remains placed along the whole radius throughout the whole piece. Moreover,

the diaphragm may be pushed axially by reaching a valve stem into the open end of the coupling. Therefore, clear and convincing evidence exists demonstrating that the G1 mattress contains these claim limitations.

Intex argues that the sealing and seating functions of the G1 device use a rigid disc, as opposed to a flexible diaphragm. As discussed above, nothing in the claims discloses a seating function. Furthermore, the flexible diaphragm in the new valve is held in place against the valve seat to create a seal in the closed position, as taught by the '726 patent. As such, clear and convincing evidence demonstrates that the G1 mattress contains these claim limitations.

Plaintiffs have presented unrebutted evidence that the remaining limitations of claims 9 and 12 are present in the G1 device. Accordingly, Plaintiffs have demonstrated by clear and convincing evidence that the G1 device infringes claims 9 and 12 of the '726 patent.

*Violation of the Injunction by Selling Products with Prohibited Product Numbers*

Plaintiffs argue that Intex has violated the injunction by selling products with product numbers prohibited by this injunction. This issue is controlled by Seventh Circuit law. *See, e.g., Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1358 (Fed. Cir. 2001) (*Shockley*). A party must prove by clear and convincing evidence that the opposing party violated an injunction. *E.g., Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995) (citations omitted) (*Goluba*). The violation need not be willful if the opposing party has not been "reasonably diligent and energetic in attempting to accomplish what was ordered." *Goluba*, 45 F.3d at 1037 (citation omitted).

10

The injunction issued on September 15, 2004 provided that:

> Intex Recreation Corp.; Quality Trading, Inc.; and Wal-Mart Stores, Inc. who receive actual notice of this order by personal service or otherwise are hereby permanently enjoined during the term of United States Patent No. 5,367,726 from making, using, selling, or offering to sell in the United States or importing into the United States inflatable products, such as air mattresses, that infringe claims 9, 12, 13, 14, or 15 of the U.S. Patent No. 5,367,726, including: (1) products bearing or equivalent to Intex product nos. 66701, 66712, 66715, 66787-66795, 66905-66922, 66985-95, 66707W, 66791W, 66792K, 66792W, 66992W, and Wal-Mart product nos. 993809, 993816, or any other inflatable products that are merely colorably different therefrom; and (2) inflatable products having the same or an equivalent one-way valve that is included in Intex product nos. 66701, 66712, 66715, 66787-66795, 66905-66922, 66985-95, 66707W, 66791W, 66792K, 66792W, 66992W, and Wal-Mart product nos. 993809 and 993816.

*Aero Prods. Int'l v. Intex Recreation Corp.*, No. 02 C 2590, 2004 WL 2255984 (N.D. Ill. Sept. 16, 2004).

Intex continued to sell products with the product numbers prohibited by the injunction until the December 15, 2004 order, which ordered Intex to immediately cease and desist selling products with product numbers prohibited by the original injunction. Neither party disputes that Intex has been in compliance with the original injunction since the December 15, 2004 order.

Intex contends that prior to the December 15, 2004 order, it believed that it was only prohibited from selling products bearing the specified product numbers and which also infringed the '726 patent and that it was not prohibited from selling any products bearing the specified product numbers that did not infringe. Intex further contends that once it learned that the injunction meant it could not sell such products on December 15, 2004, it immediately complied with the injunction.

Intex's position is disingenuous, to say the least. The permanent injunction, at issue, provides that Intex is "permanently enjoined during the term of United States Patent No. 5,367,726 from making, using, selling, or offering to sell in the United States or importing into the United States inflatable products, such as air mattresses, that infringe claims 9, 12, 13, 14, or 15 of U.S. Patent No. 5,367,726, including" the products with the prohibited numbers. This

11

language is identical to the language proposed by Plaintiffs after the trial. (Pls.' Mot. for Entry of Permanent Injunction, Ex. A, July 7, 2004). Intex clearly understood the plain meaning of this language. In objecting to the inclusion of this language in the permanent injunction as proposed by Plaintiffs, Intex argued:

> [T]he proposed permanent injunction is inappropriate as it is based upon [Intex's] model numbers and improperly extends the jury's verdicts to, at present, two recessed pump designs which have not been adjudicated to infringe the '726 patent. As presented, the permanent injunction broadly enjoins the manufacture use [sic], offer for sale, and sale of **any** product bearing those product numbers irrespective of the pump type used therein.

(Intex's Opp. to Mot. for Permanent Injunction, at 5, July 19, 2004) (emphasis in original).[1]

This Court addressed this issue and the reason for the inclusion of this language regarding the use of product numbers when issuing the injunction.

> "Plaintiffs correctly argue that using product numbers would enable efficient policing of the marketplace to ensure Intex complies with the injunction. Moreover, the parties used product numbers throughout the litigation to identify the infringing products. **Intex, with full knowledge of these facts, did not change the product numbers when it purportedly redesigned the infringing product to prevent this situation. Accordingly, product numbers are appropriate to identify the products subject to the injunction and will be included in the injunction order.** It is noted that the injunction order will also identify the product subject to the injunction by patent and claim number."

*Aero Prods. Int'l v. Intex Recreation Corp.*, No. 02 C 2590, 2004 WL 20091996, at *3 (N.D. Ill. July 15, 2004) (emphasis added). Intex's disagreement now with that injunction language and

---

[1] Intex has also filed seemingly contradictory sworn statements in this regard. In paragraph 5 of a declaration attached to Intex's Opposition to the Motion for a Permanent Injunction, filed on July 19, 2004, William Smith, Assistant Secretary of Intex, declared under the penalty of perjury that "the proposed permanent injunction submitted by Plaintiffs is overly broad insofar as it is based on [Intex's] product numbers and, as such, would apply not only to the external pump design which was the subject of the trial, but also to the two recessed pump designs [including the G1 bed] which have been shipped by the manufacturer since January, 2004."

Paragraph 2 of Smith's declaration, filed in this proceeding on February 4, 2005, now declares, again under the penalty of perjury, that "[p]rior to December 15, 2004, [Intex] had understood the Permanent Injunction entered on September 15, 2004 prohibited the sale and distribution of products bearing the identified product numbers and that also infringed the '726 patent."

the rationale which supports it does not obviate Intex's obligation to obey the decree until it is modified or reversed. *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 386 (1980).

## Damages

Civil contempt sanctions may be entered to coerce compliance with an injunction or compensate the complainant for the violation of the injunction. *Connolly v. J.T. Ventures*, 851 F.2d 930, 932 (7th Cir. 1988) (*Connolly*). "A court has broad discretion to fashion a remedy based upon the nature of the harm and probable effect of alternative sanctions." *Connolly*, 851 F.2d at 933.

Plaintiffs contend that Intex should be punished for deliberately violating the injunction and ask for an award of treble patent damages and attorneys' fees for bringing this contempt motion based on Intex's violations of the injunction. In support of their argument, Plaintiffs cite *Spindelfabrik Suessen-Schurr v. Schuber & Salzer Maschinefabrik Aktiengesellschaft*, 903 F.2d 1568, 1578 (Fed. Cir. 1990) (*Spindelfabrik*). In that case, however, the defendants engaged in "flagrant contemptuous conduct" by violating an injunction on four occasions. *Spindelfabrik*, 903 F.2d at 1576-77. Furthermore, the defendants violated the injunction with full knowledge of the injunction's provisions. *Spindelfabrik*, 903 F.2d at 1576-77.

The imposition of treble damages and attorneys' fees would be unjust and not fairly related to the harm suffered by Plaintiffs through sales of the G1 mattress and the sales of products bearing prohibited product numbers. Instead, to the extent it has yet to do so, Intex is required to account for all products bearing the prohibited product numbers which it sold between September 15, 2004 and December 15, 2004, and for all sales of G1 mattresses.

Regarding the amount of damages Plaintiffs are entitled to for these sales, Plaintiffs have filed a Motion to Enter Supplemental Damages Calculation which seeks to apply the 13.5 percent royalty rate. The proper amount of damages for sales of the G1 mattress and mattresses with the prohibited product numbers will be considered in ruling upon that motion.

## **CONCLUSION**

THEREFORE, THE COURT RULES AS FOLLOWS:

A. Plaintiffs' Motion for Contempt is granted, and Intex is found to be in contempt of the injunction issued on September 15, 2004.

B. Plaintiffs' motion for an award of treble damages and attorneys' fees is denied.

C. Intex is required to account for all sales of G1 mattresses and for all products bearing the prohibited product numbers which were sold between September 15, 2004 and December 15, 2004.

Dated: May 11, 2005

JOHN W. DARRAH
United States District Judge