**FILED**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUN _ 1 2005 WH

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| Aero Products International, Inc., a Florida corporation, and Robert B. Chaffee, an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>Intex Recreation Corp., a California corporation, Quality Trading, Inc., a California corporation, and Wal-Mart Stores Inc., a Delaware corporation,<br><br>        Defendants. | Case No.: Case No. 02 C 2590<br><br>Judge John W. Darrah<br><br>Magistrate Judge Geraldine Soat Brown |

## MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT INTEX RECREATION CORP. TO STAY AWARD OF DAMAGES FOR G1 SALES PENDING AN EVIDENTIARY HEARING

## I.    INTRODUCTION.

This Court's Memorandum and Order of May 11 directs Defendant Intex Recreation Corp. ("IRC") to provide, among other things, an accounting of the sales of the products with the "G1" design that the Court has now found to infringe the '726 patent. ("G1 design products"). IRC is proceeding to provide an accounting of such sales as ordered by the Court; however, it is also clear that the record includes no evidence upon which the Court may base an award of a royalty on these products.

Plaintiffs' motion for a "supplemental" damages calculation previously filed herein, simply requests, without any support, that if the Court finds the G1 design products do infringe, the royalty rate from the jury's verdict in February 2004 should be applied to all G1 design product sales. IRC pointed out in its opposition that the record is devoid of any of the evidence Plaintiff's own expert required to render his evaluation in the case in chief as to the

external pump products. It is telling that Plaintiffs' reply to IRC's opposition fails to address this issue at all and thereby admitting that the record is, in fact, without of any evidence upon which this Court, or any trier of fact, could render a determination as to the applicable reasonably royalty rate for the G1 design products sold after January 1, 2004. As the Court is aware, the GI design product is a significantly re-designed product, with the entire pump and valve structure reconfigured to be completely within the mattress itself. As is readily apparent, many of the factors, such as costs, advantages, profit margins, etc., must be different for this redesigned product. Thus, as the Court has now found that the G1 design products infringe the '726 patent and ordered an accounting, IRC requests that any award of damages arising out of the sales of G1 design products be stayed until the Court can conduct a full evidentiary hearing on the applicable royalty rate.

## II.   THERE IS NO BASIS TO APPLY THE ROYALTY RATE FOR EXTERNAL PUMP TO G1 DESIGN PRODUCTS.

### A. Plaintiffs Relied Upon Extensive and Detailed Information In Order To Calculate Its Claimed Reasonable Royalty Rate.

35 U.S.C. § 284 provides that in the event of finding infringement, the court shall award damages "adequate to compensate" the claimant, but "in no event less than a reasonable royalty." Section 284 goes on to state that the court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances. At the heart of the analysis is the requirement that the royalty be "reasonable" under all the circumstances. Trell v. Marlee Electronics Corp., 912 F.2d 1443, 1446 (Fed. Cir. 1990). As the Court is aware, at trial both sides proffered expert testimony as to the royalty rate that should be applied and the basis thereof. The research and evaluation necessary to make that calculation was extensive. In fact, Aero's own expert, Mark Peterson, testified that he and his

company expended over 1100 hours of time (Tr 476) to prepare that analysis.[1]  Mr. Peterson himself expended over 350 hours in preparing these calculations and his two reports. Id.

It is clear from the analysis of Mr. Peterson and his company that they were required to review extensive and detailed information in order to render the opinion contained in the two reports and as testified to at trial. (Tr 481).  Moreover, Mr. Peterson emphasized throughout his testimony that in rendering a valuation opinion such as in the instant action, one must always do so in the "context" of the overall market, etc. (Tr 477).  Thus, it then follows that in order to determine the applicable royalty rate for the G1 design products, such must also be done in the "context" of the sales of those products, not another product.  This is particularly true in this instance of the GI design products, with their significant re-design of the pump and valve housing, must require another analysis of the manufacturing and sales costs, the applicable margins as well as the "selling decisions" of the consumers which Mr. Peterson extensively reviewed as to the external pump product.  It goes without saying that the design entails a different analysis, which is absent here.

Furthermore, it also follows that this "context" would include information relative to the sales at Wal-Mart, the largest customer of IRC for the accused products at trial, as well as its other customers.  Indeed, Mr. Peterson's analysis at trial entailed such an analysis of both Wal-Mart and the "other" sales of accused products (Tr 482).  As to the Wal-Mart sales, Mr. Peterson testified that he reviewed very detailed reports generated by Wal-Mart that included a breakdown of its sales not only by store, but by "modules" as well. (Tr 487-488).  This detailed analysis was required since not all of the accused products, as well as Aero's own products, were in each Wal-Mart store, let alone on each module. (Tr 487-488, 495-496).  As a result of this review and analysis, Mr. Peterson was able to rank the airbed sales at Wal-Mart not only as between IRC and Aero, but also regarding other competitors. (TX 420A).  This

_____

[1]     For the Court's convenience, attached to this memorandum as Exhibit "A" are the cited excerpts from the trial transcript and copies of the cited trial exhibits are attached hereto as Exhibit "B."

included an evaluation of Wal-Mart's sales at a module level, as well as a "recalculation" of Wal-Mart's sales based upon this analysis. (Tr 497).

The foregoing information was critical to Mr. Peterson's analysis of the percentage of sales that IRC would presumably lose if it removed its accused products. That information was then utilized in his evaluation of what would be reasonable royalty.

In the same vein, Mr. Peterson also used information that he reviewed or extrapolated from other materials produced in this matter to "estimate" the manufacturing costs for the external pump products of IRC's supplier. (Tr 499).

Furthermore, his analysis included not only the profits of IRC for the external pump products, but also of Aero on its products. He thereupon used such, along with the foregoing information, to reach his conclusion as to the maximum royalty IRC would have, theoretically, accepted, (Tr 502; TX 422B), and the minimum royalty Aero would have, theoretically, agreed to. (Tr 505-507; TX 440).

### B. There Is No Evidence To Support Claimed Royalty Rate.

As to the G1 design products, Plaintiffs have offered no evidence to justify the imposition of the identified royalty rate as to this completely different product. The expert reports and testimony in this action were predicated upon specific information relating to the external pump product, its placement on the various retailers' shelves and estimated manufacturing costs. No analysis has ever been performed by any expert regarding these specific issues as to the sale of the G1 design products. Accordingly, Plaintiffs have failed to provide this Court with any basis upon which to determine a royalty rate, let alone any basis upon which to blindly adopt the rate awarded by the jury as to a completely different product.

As Mr. Peterson remarked at trial, his analysis of the market, and the basis of his opinions, had to be made for a "very defined period." (Tr 479). The results of his analysis of the various factors identified in Section II, A, above, were presented to the jury and, presumably, were relied upon in reaching the verdict.

It is clear, therefore, that a calculation of a reasonable royalty for sales of G1 design products cannot be derived from the information from the sale of external pumps from 2000 through 2003. The G1 design products were sold at the same time, and to the same customers, as the remaining inventory of the external pump product adjudicated at trial. This must affect the analysis as it relates to sales by IRC as well as its competitors. As recited above, no information as to the sales of the G1 design products, no Wal-Mart module sales information or per store sales have been reviewed to determine any of the foundational information originally relied upon by Mr. Peterson. It is also telling that Aero has failed to provide any support or explanation as to why the jury's determination as to a royalty for the external pump should be applied to a completely re-designed product, sold at different prices and four years after the initial introduction of the external attached pump products.

Aero is requesting this Court to apply the jury's apparent royalty rate to the G1 design products in a vacuum, without any basis on the record. Thus, the Court's award should properly only be predicated on a complete record, with the requisite evidentiary showing.

## III.   CONCLUSION.

Based upon the foregoing, it is respectfully requested that the Court's award of

damages arising from the sale of G1 design products after January 1, 2004 be stayed until the

Court can entertain an evidentiary hearing as to the applicable reasonable royalty rate.

Respectfully submitted,

**LEYDIG, VOIT & MAYER, LTD.**
MARK E. PHELPS
M. DANIEL HEFNER

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
DAVID N. MAKOUS (Cal. Bar No. 82409)
THOMAS S. KIDDE (Cal. Bar No. 61717)

DATED: June 1, 2005            By: _____
                                      M. Daniel Hefner
                                      Leydig, Voit & Mayer, Ltd.
                                      Two Prudential Plaza
                                      Suite 4900
                                      Chicago, IL 60601
                                      (312) 616-5600

                                      Attorneys for Defendant and
                                      Counterclaim Plaintiff Intex Recreation
                                      Corp., and Defendants Quality Trading
                                      Inc. and Wal-Mart Stores, Inc.



```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
    AERO PRODUCTS INTERNATIONAL, INC., a          )
 4  Florida corporation, and                      )
    ROBERT B. CHAFFEE, an individual,             )  No. 02 C 2590
 5                                                )
                    Plaintiffs,                   )  Chicago, Illinois
 6                                                )  February 23, 2004
                                                  )  9:55 a.m
 7            v.                                   )  Trial
                                                  )
 8  INTEX RECREATION CORP., a California          )
    Corporation, QUALITY TRADING, INC., a         )
 9  California corporation, and WAL-MART          )
    STORES, INC., a Delaware corporation,         )
10                                                )
                    Defendants.                   )
11
                        VOLUME 4
12
                 TRANSCRIPT OF PROCEEDINGS
13    BEFORE THE HONORABLE JOHN W. DARRAH, and a jury

14  APPEARANCES:

15  For the Plaintiffs:    BRINKS, HOFER, GILSON & LIONE, by
                           MR. WILLIAM H. FRANKEL
16                         MR. DAVID H. BLUESTONE
                           MR. MICHAEL P. CHU
17                         MR. MARK H. REMUS
                           NBC Tower - Suite 3600
18                         455 Cityfront Plaza Drive
                           Chicago, Illinois 60611
19
    For the Defendants:    LEWIS BRISBOIS BISGAARD & SMITH LLP, by
20                         MR. DAVID N. MAKOUS
                           MR. THOMAS S. KIDDE
21                         MR. SCOTT MAYNARD
                           221 N. Figueroa Street - Suite 1200
22                         Los Angeles, California 90012

23
              Valarie M. Harris - Official Court Reporter
24             219 South Dearborn Street - Room 1212
                      Chicago, Illinois 60604
25
```

Peterson - direct

1  Q  Did you do all of the work on this case yourself?

2  A  No, I didn't. I had a team of people who assisted me in

3  this case. And I might use the word "we" sometimes in my

4  testimony, and that's really meant to refer to myself and my

5  associates as opposed to myself and Aero or myself and Aero's

6  counsel.

7  Q  Could you describe the types of information you considered

8  in forming your opinion?

9  A  Yes. We started -- we went to websites of the major

10  competitors in this business. We looked at all of the

11  documents that were produced by Intex, Aero, Wal-Mart,

12  Coleman, others. And we read the depositions of the people

13  who were involved, and I read most of those depositions

14  personally.

15       We went to stores, in fact, and looked at products as

16  they were sold on the shelf.

17  Q  Approximately how many hours have you and your team spent

18  preparing your opinion in this matter?

19  A  Well, we have over 1100 hours as a team in this, and I

20  personally have over 350.

21       MR. REMUS: Your Honor, at this time we'd tender

22  Mr. Peterson as an expert in the valuation of intellectual

23  property.

24       THE COURT: Mr. Makous, do you wish to voir dire the

25  witness?

1    MR. MAKOUS:  No objection, Your Honor.

2    THE COURT:  I find that Mark Alan Peterson is an

3  expert in the area of valuation of intellectual property.

4    You may proceed.

5  BY MR. REMUS:

6  Q   Mr. Peterson, did you form an opinion about a royalty that

7  Aero is entitled to if Intex is found to have infringed Aero's

8  patent rights?

9  A   Yes, I did.

10  Q   And what is that royalty?

11  A   Well, essentially, that the royalty should be 15.7 percent

12  of the accused sales.  The accused sales is a matter of about

13  21.8 million.

14  Q   Could you explain to the jury the importance of context in

15  forming your opinion?

16  A   Yes.  Whenever I teach a seminar on valuing intellectual

17  property, one of the first concepts that I think you want to

18  cover is the idea of context.  And context is very important

19  because in doing a valuation you can make certain assumptions

20  and depending on what assumptions you make or why you're doing

21  the valuation you might come to different conclusions.

22    As an analogy, and I use this sometimes, if you were

23  to think about a watch, let's pretend you own a watch, and the

24  watch is just a basic watch, and it's the same kind of watch

25  that's been made for, say, the last 60 years, 70 years, and

Peterson - direct

1  context that they were done. If I just asked you simply what

2  do grandfathers' watches usually go for, you know, you might

3  come up with a different number than I said value that watch

4  as a timepiece.

5     So in this case the context is Intex's use of Aero's

6  intellectual property in a very defined time period. It's not

7  a more broad based type of valuation.

8  Q  And to apply your analogy to this case, is effectively the

9  '726 technology the watch that you just described?

10 A  Yes, that would be the analogy.

11 Q  And in forming your opinion, did you consider the

12 importance of that technology to Aero and then the importance

13 of that technology to Intex?

14 A  Yes, we did. That would be a standard thing I would do in

15 a valuation.

16 Q  Mr. Peterson, did you help prepare an exhibit that

17 summarizes how you arrived at your opinion?

18 A  Yes, I did.

19     MR. REMUS: Jim, could you please display Trial

20 Exhibit 435 A?

21 BY MR. REMUS:

22 Q  Mr. Peterson, could you, using this exhibit, explain to

23 the jury how you arrived at your opinion?

24 A  Well, essentially there are a variety of facts that we

25 wanted to deal with, and we start out with what I'll -- in the

1  Q    Thank you.

2        Mr. Peterson, prior to forming your opinions in this

3  matter, did you study the competition between Aero and Intex?

4  A   Yes, we did.  We studied how they looked on the shelves.

5  We looked at all the documents that talked about competition.

6  We've seen a number of them projected on the screen in this

7  case so far.  And we did study that in great detail.

8  Q   Did you find that Aero and Intex shared any common

9  customers?

10 A   Yes.  Obviously, there will be definitions of common

11 customers.  We define common customers as customers who were

12 willing to buy products from both parties.  So we could look

13 at the sales records, and we could see that in fact the

14 customers was willing to buy an Aero product, they were

15 willing -- and put that on their shelf or in their catalog,

16 and the customer was also willing to purchase Intex products.

17 Q   And were you able to quantify how much of an overlap there

18 was between Aero's customers and then customers of the accused

19 Intex products?

20 A   Yes.  Well, remembering, you know, to take it back to

21 that, what we're looking at is the accused sales, so I try to

22 refer to, you know, what of those accused sales, how many of

23 those accused sales were sold to common customers and then how

24 many of those accused sales were sold to customers where, say,

25 Aero wasn't able to sell.  And of those sales, approximately

Peterson - direct

1  87 percent of the accused sales were sold to customers who

2  also bought product from Aero.

3  Q   What percentage of the accused sales were made to

4  Wal-Mart?

5  A   67 percent.

6          That's a very important point in this case.  Because

7  Wal-Mart was such a big customer, we basically in doing our

8  analysis divided it into two pieces, Wal-Mart and everybody

9  else, because we believe that you needed to look at those two

10  pieces separately.

11  Q   Now, Aero wasn't selling its airbeds in Wal-Mart during

12  the entire period of infringement, were they?

13  A   That's correct.  They were not.

14  Q   Did you see any evidence that Aero had to compete for

15  shelf space or that Aero would have been in Wal-Mart sooner

16  but for Intex's accused sales?

17  A   Well, we certainly saw there were at least some

18  correspondence between the parties, and I'd spoken with Aero

19  people about this issue, and the fact is that in early 2000

20  Aero was making a pitch to sell their airbeds to Wal-Mart, and

21  there are documents that suggest that they were looking to do

22  that, and it was right after that that Intex actually

23  successfully made the sale of their accused products.

24  Q   Did you see any evidence that Aero had to compete with

25  Intex in any catalogs?

Peterson - direct

1  A   Right.  The customers who bought the accused, 87 percent

2  of the accused products were sold to customers who also bought

3  Aero products.

4  Q   And then there was another 13 percent there that did not

5  overlap?

6  A   Well, yes, there's another 13 percent that didn't ever

7  purchase from Aero, which doesn't mean that Aero didn't go in

8  and try to make that sale, but we didn't see evidence of that

9  specifically.

10 Q   Do Aero and Intex have to be competing in the same stores

11 and on the same shelves in order for there to be competition

12 between the two companies?

13 A   No, certainly not.  There's documents in the case, a

14 number of them, I think there was one put up the other day,

15 which talked about how Aero had come in -- or Intex had come

16 in the day after Aero made a presentation and offered Mervin's

17 or somebody the product for a lower price and in effect

18 knocked Aero out.

19 Q   Did you see any evidence that customers were willing to

20 pay more for the features of the '726 patent?

21 A   Yes, I did.

22 Q   What was that evidence?

23 A   Well, in the documents that were produced to us by

24 Wal-Mart, there was a group of documents which we'll talk

25 about, the modular sales analysis, and these were pretty

1   detailed sales records, and when you look at specific

2   comparisons, for example, the raised queen bed was sold both

3   with the accused feature and without the accused feature, and

4   despite being higher priced and despite -- so you would expect

5   that might not sell as well, the accused product actually sold

6   much better on a comparison basis.

7           MR. REMUS:  With that background, Jim, could you put

8   up Trial Exhibit 435 A?

9   BY MR. REMUS:

10  Q    And this was the summary we looked at.  Now, going back to

11  this summary, could you explain what the first step was in

12  your analysis?

13  A    Well, the first step was to look at the actual licensing

14  policies that were, you know, in effect and look at the

15  licenses, that it's changed hands.  And when we looked at all

16  of the licenses, and there's been some testimony, Mr. McColgan

17  talked about them in some length, but particularly the Coleman

18  license, the license between two parties who at the beginning

19  weren't competitors and then later on became competitors.

20  They ended up on the same page of the catalog.  And so we

21  started to focus on the Coleman license because it was a

22  competitive license.

23  Q    And what did the Coleman license tell you about what an

24  appropriate royalty should be?

25  A    Well, when we looked at the Coleman license, we saw that

1  get into Wal-Mart or any other retailer, that they would in

2  fact lose 65 percent of those sales.

3  Q   And is the other side of that coin that Intex would keep

4  35 percent of their sales?

5  A   Yes, yes.

6  Q   How, specifically, did you arrive at this number of 65

7  percent?

8  A   Well, basically what we did was we went through -- and I

9  talked earlier -- a little bit earlier about these modular

10 sales analyses that Wal-Mart produced.

11      First we separated our analysis into both Wal-Mart

12 and non-Wal-Mart.  And I'll talk first about the Wal-Mart

13 because, obviously, they're the biggest portion, and we

14 actually had the most detailed records with respect to

15 Wal-Mart.

16      And the Wal-Mart sale -- they had these reports they

17 called modular sales analysis, and basically what a modular

18 sales analysis, if you walk into a Wal-Mart store, you'll be

19 confronted with either four feet of width of shelf that has

20 airbeds on it, eight feet of shelf that has airbeds on it, 12

21 feet or 16 feet, depending on which Wal-Mart store you walk

22 into, where you walk into those stores.  And so one of the

23 things we discovered very quickly early on was that the

24 four-foot module doesn't contain any of the accused products.

25 They aren't sold in the four-foot modules.  So then we were

1    able to sort of take that out of the equation and look at the

2    eight-foot module, the 12-foot module and the 16-foot module

3    with a great deal of precision.

4            And the other thing that these documents did is it's

5    important to note that all of the products aren't in all of

6    the stores.  So if Wal-Mart has 2800 stores, obviously, a

7    product that sells in all 2800 will have a better chance of

8    having high sales than a product that sells in, you know, only

9    a thousand stores or even some lower number.

10            But what these documents did was then they took the

11    sales at each store and -- in each module and they add them up

12    and divided by the number of stores so you could see how well

13    a product sold.  Even if it didn't sell in all 2800 stores,

14    you could make a very detailed comparison.  And that was the

15    -- what we used as really the basis for looking at how do the

16    products compete.

17            And in 2003, that's when Aero started selling, so we

18    were able to look at their modular sales analysis in 2003 and

19    make some pretty good comparisons.

20            Specifically, after -- now I've explained, you know,

21    the documents we used to look at.  Then specifically what we

22    did was fairly standard technique for going in and saying,

23    okay, what would happen if you pulled the accused products out

24    of the mix and recalibrated the market shares.  How much would

25    Coleman get, how much would Intex get, and how much would Aero

1   get.

2   And we did one other thing, which was to note that --

3   and I pointed out earlier the ten-dollar low-priced bed.  We

4   sort of pulled out the vinyl bed from Intex, and we said

5   that's no way that's really competing.  While I think I see

6   competition as sort of a continuum, we believe that that

7   wasn't really a competitive bed.

8   And so when you then recalibrate these market shares,

9   you get pretty much 65 or 60 to 65 percent, and so we used 65

10  percent.

11  Q   Did you then take this 65 percent number, multiply it by

12  the profits in order to determine the value to Intex of taking

13  a license under that patent?

14  A   Well, yes, that would be the logical next step.

15  Q   Did you determine the profitability of Intex's accused

16  products?

17  A   Yes, we did.

18  Q   What did you determine that profitability was?

19  A   Well, we used -- we determined their profitability was in

20  the range of 30 percent.  There's a variety of things that we

21  did to arrive at that.

22  Q   How did you arrive at that number?

23  A   Well, we started by looking at Intex's overall financial

24  statements.  And one of the things that you note when you look

25  at Intex's overall financial statements is that they -- or at

Peterson - direct

1    least -- and when I say Intex here, I'm referring to Intex

2    Recreation Corp. based in Long Beach.  And their financial

3    statements firm-wide show in almost every year under a two

4    percent profit.  They make very little money.

5         And then if you look at the products on a profit line

6    basis -- or product line basis so you can just look at

7    airbeds, you'll see that they, again, make very little money,

8    under -- generally under five percent.

9         We heard Mr. Makous in opening argument say that

10    Intex's profits are 10.10 percent roughly, and those numbers

11    don't come from their financial statements.  They come from an

12    adjustment to their financial statements.  So, you know, we've

13    already made that move.

14         In looking at the profits of Intex, one of the things

15    that we were very aware of was that all we were allowed to see

16    were the landed costs.  And that's a term that they use that

17    basically means when the product lands in Long Beach, they get

18    charged by one of the other Intex sister companies a certain

19    price.  That price is -- then determines basically their cost

20    of goods sold.  So that's their input price.

21         Now, we weren't allowed to see any of the financial

22    statements of any of the other Intex companies, so the only

23    price we could, you know, actually look at were those prices.

24         But in going through the documents in the case, we

25    discovered there was a study that was done by Wal-Mart.

1   Because, as I think we all know, Wal-Mart is consistently

2   interested in lowering their prices and getting lower prices

3   from their vendors, and so they had done a study of what would

4   happen if they decided to replace Intex.  So they priced out

5   what they thought the bed should cost as a tool to help either

6   lower prices from Intex or potentially find another supplier.

7   Q    And what did this Wal-Mart study tell you?

8   A    Well, basically the implication from the study was that

9   there was about a 29.7 percent profit margin built into these

10  beds; that if Wal-Mart would import, bring the beds into their

11  place themselves, then they would in fact save a lot of money.

12          Now, one of the places they went to get this

13  information, they got two competitive prices, and they also

14  went to Intex's manufacturing plant and got a quote directly

15  from them.

16          So we went and looked at the analysis and were able

17  to come up with the fact that in general this study suggested

18  that the profits were probably closer to 30 percent than ten

19  percent or two percent.

20  Q    Now, the study that Wal-Mart did, they looked at -- this

21  particular study, was a nonaccused product; is that right?

22  A    Yes.

23  Q    Do you see any reason to believe the profitability would

24  be any different for a nonaccused airbed versus an accused

25  airbed?

1    companies, and he said, yes, sometimes I have to negotiate

2    with myself.  I have to approve both of these prices.

3            So in fact, you know, there is evidence that the

4    prices can be set basically wherever anybody wants to.

5    Q    Mr. Peterson, did you help prepare an exhibit that then

6    applies these profitability numbers you calculated with the

7    lost sales that Intex stood to lose?

8    A    Yes, I did.

9            MR. REMUS:  Jim, could you display Trial Exhibit 441?

10   BY MR. REMUS:

11   Q    Now, could you explain to the jury what Trial Exhibit 441

12   shows?

13   A    Yes.  We simplified -- remember I said that we did our

14   analysis of both Wal-Mart and other companies, and you'll

15   notice that we expected that basically Intex would lose about

16   65 percent in both cases.  And the profitability is 30.5

17   percent, which is really an average of two different profit

18   numbers.  And when you weight that to get the proper number,

19   rather than putting up a lot of confusing math on the board,

20   basically we've simplified this, and that comes out to a 19.9

21   percent maximum acceptable royalty to Intex.

22           And that's saying that in an economic concept if they

23   paid more than that, they probably shouldn't.  They probably

24   should reject a license at that point, at least in a

25   negotiating sense.

Peterson - direct

1  BY MR. REMUS:

2  Q.  Mr. Peterson, how does this chart explain your analysis?

3  A.  Well, basically remembering that what we're talking about

4  is sales of common customers, but what we've added here, we're

5  not just talking about the accused product; we're talking about

6  places where Intex sells the accused product along with

7  nonaccused products.  That would be Wal-Mart.  That's sort of

8  -- those type of companies are the bar on the left-hand side of

9  the chart.

10          If you look at that bar, you see that Aero in its

11  market share relative to Intex takes about 27 percent of the

12  sales at those common customers and then accordingly loses 73

13  percent of the sales.  But when you go to companies like Target

14  where Intex does not sell the accused product -- and there are

15  a lot more companies than Target, but I use that that as a

16  similar example -- you see that Aero ends up selling 63 percent

17  of the dollar sales as opposed to then Intex correspondingly

18  gets 37 percent.  So that yellow area of the difference is the

19  difference between what happens when Intex sells the accused

20  product and when they don't.

21  Q.  And did you then use Aero's profits to determine or to

22  quantify how much money it would be losing by licensing a

23  competitor?

24  A.  Yes, we did.  We looked at Aero's profits and looked at

25  what profitability was most likely to be applicable at

Peterson - direct

1  Wal-Mart, and then based on the types of beds they sold there,

2  and then what profitability was supposed to be in other areas,

3  you know, and we were able to make a comparison.

4         MR. REMUS:  Jim, could you display Trial Exhibit

5  435D?  Excuse me.  I'm sorry.  It's 440.

6     (Brief pause.)

7  BY MR. REMUS:

8  Q.  Could you explain how you performed this calculation on

9  Trial Exhibit 440?

10  A.  Certainly.  At Wal-Mart, we thought that Aero would

11  actually get a 15 percent margin, and that's based on, you

12  know, the competitive situation at Wal-Mart and a very detailed

13  review of the modular sales analysis and other items.  Then we

14  looked at how Aero sold, you know, in other places outside of

15  Wal-Mart.  We believe that basically 25 percent was the amount

16  that made sense there, and we did a variety of tests in our

17  analysis to suggest that that was, in fact, a reasonable

18  opinion, considering all the evidence.

19         When you weight those two numbers and then come down,

20  you come up to a minimum acceptable royalty of about 6.76

21  percent, and that royalty, similar to the Aero number, is sort

22  of saying -- or the Intex number that we talked about earlier

23  is saying where would or what royalty is just too low for Intex

24  in the competitive situation, I mean, where should they walk

25  away from the deal and just say:  No, we won't grant a license.

Peterson - direct

1    So that's at 6.76 percent.

2    Q. And this is an approximation of the minimum that Aero would

3    accept in a negotiation for a royalty?

4    A. Certainly.

5    MR. REMUS: Jim, could you take us to 435D which is

6    Mr. Peterson's summary chart?

7    BY MR. REMUS:

8    Q. We just finished the importance to Aero. What was the next

9    step in your analysis?

10   A. Okay. Well, now we come down to what's known as the

11   hypothetical negotiation. Thinking back to the watch analogy,

12   this is now where we force you, even though you don't want to

13   sell your grandfather's watch, your Harry Truman watch, to

14   actually come to a negotiation.

15   We have to assume some things. The first thing we

16   assume is that the patent is valid and infringed, and that's

17   something that generally isn't in a normal negotiation. When I

18   assist clients who are negotiating things, generally when the

19   parties walk into the room, the first thing the guys say is:

20   Well, your patent is invalid, so we'll pay you a couple of

21   pennies to save lawyer fees.

22   Then the other guy says: Well, you know, you're

23   going to get hit with an injunction.

24   So there's a give-and-take. In this type of a

25   hypothetical negotiation in a courtroom setting, we have to

# B

# Airbeds Ranked by Price at Wal-Mart

**Legend:** Aero ■ | Intex ■ | Coleman ▨



| Product | Price |
|---------|-------|
| Queen Minute Sport | $96 |
| Twin Minute Sport | $67 |
| Queen Raised Pillowtop (w/Fastill) | $55 |
| Queen Raised (w/Fastill) | $49 |
| Queen Fastill | $48 |
| Full Fastill | $44 |
| King Flocked | $39 |
| Queen Raised | $36 |
| Queen Dual Chamber | $29 |
| Queen Fastill - Kit | $25 |
| Queen Flocked | $24 |
| Twin Flocked | $20 |
| Queen Fabric Flocked | $18 |
| Queen Fabric | $17 |
| Full Vinyl | $16 |
| Queen Vinyl | $15 |
| Twin Fabric | $15 |
| Twin Vinyl | $10 |

Source: Bates WW10C0451-452



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Aero Products International, Inc., a Florida corporation, and Robert B. Chaffee, an individual, | ) ) ) | Case No.: Case No. 02 C 2590 |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Judge John W. Darrah |
| Intex Recreation Corp., a California corporation, Quality Trading, Inc., a California corporation, and Wal-Mart Stores Inc., a Delaware corporation, | ) ) ) ) | |
| Defendants. | ) ) ) | Magistrate Judge Geraldine Soat Brown |

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the attached:

- **NOTICE OF PRESENTMENT OF MOTION OF DEFENDANT INTEX RECREATION CORP. TO STAY AWARD OF DAMAGES FOR G1 SALES PENDING AN EVIDENTIARY HEARING**
- **MOTION OF DEFENDANT INTEX RECREATION CORP. TO STAY AWARD OF DAMAGES FOR G1 SALES PENDING AN EVIDENTIARY HEARING**
- **[proposed] ORDER STAYING AWARD OF DAMAGES FOR G1 SALES PENDING AN EVIDENTIARY HEARING**
- **MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT INTEX RECREATION CORP. TO STAY AWARD OF DAMAGES FOR G1 SALES PENDING AN EVIDENTIARY HEARING (Including Exhibits A and B thereto)**

were served upon Plaintiffs Aero Products International, Inc. and Robert B. Chaffee via hand

delivery to their attorneys at the following address on the date indicated below:

William H. Frankel
Michael P. Chu
David H. Bluestone
Mark H. Remus
Christopher M. Dolan
**Brinks Hofer Gilson & Lione**
NBC Tower, Suite 3600 - 455 North Cityfront Plaza Drive
Chicago IL 60611-5599

Copies of documents required to be served by Fed.R.Civ.P. 5(a) have been served.

**LEYDIG, VOIT & MAYER, LTD.**
MARK E. PHELPS
M. DANIEL HEFNER

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
DAVID N. MAKOUS (Cal. Bar No. 82409)
WILLIAM C. STEFFIN (Cal. Bar No. 54626)
THOMAS S. KIDDE (Cal. Bar No. 61717)

DATED: June 1, 2005            By: _____
                                          M. Daniel Hefner
                               Attorneys for Defendant and Counterclaim
                               Plaintiff Intex Recreation Corp., and
                               Defendants Quality Trading Inc. and Wal-
                               Mart Stores, Inc.

4830-1756-7744.1                     –2–