# EXHIBIT H



**INTERNATIONAL
BANKING**

**ICC Uniform Customs and Practice for**

# Documentary Credits



**International Chamber of Commerce**

The Uniform Customs and Practice for Documentary Credits were first published by the ICC in 1933. Revised versions were issued in 1951, 1962, 1974 and 1983.

This Revision was adopted by the ICC Executive Board in April 1993 and first published as ICC Publication N°500 in May 1993.

This English language edition of Publication N°500 gives the official text of the 1993 Revision. The official French translation is also published by ICC Publishing S.A. Translations in other languages and bilingual versions may be available from ICC National Committees.

*International Chamber of Commerce.*

## ICC Uniform Customs and Practice for

# Documentary Credits

Published in May 1993 by
ICC PUBLISHING S.A. (Paris) and
ICC PUBLISHING, INC. (New-York)

Copyright © 1993
**International Chamber of Commerce**

All rights reserved. No part of this work may be reproduced or copied in any form or by any means — graphic, electronic, or mechanical, including by photocopying, recording, taping, or information retrieval systems — unless prior written permission has been obtained from the International Chamber of Commerce through ICC Publishing, S.A. in Paris or ICC Publishing, Inc. in New York

**ICC Publication N° 500**
ISBN 92-842-1155-7

LOS ANGELES COUNTY LAW LIBRARY



1993 Revision in force as of January 1, 1994

*K81*
*I23*
*1994*
*c.4*

# FOREWORD

One of the core tasks of the ICC is to make it easier for companies in different countries to trade with each other, thus contributing to the expansion of international commerce.

The means include ICC rules for the conduct of trade and payments, of which the Uniform Customs and Practice for Documentary Credits are the foremost example.

All embody a basic ICC principle, self-regulation by business. They are devised by experts from the private sector, working in ICC Commissions, who give generously of their time for the benefit of the wider business community.

The universal acceptance of these rules and definitions is a convincing demonstration of the ability of business people in countries with differing legal systems to apply their own practical mechanisms for the conduct of trade.

In a world of fast-changing technology and rapidly improving communications, periodic revision of ICC rules for trade facilitation is inevitable. And the rules must not only keep pace with new technology. They must also take account of current legislation, both national and international.

Documentary credit usage is no exception. This revision of the rules takes account of changes over the past 10 years. The publication of UCP 500 is a major event for bankers, lawyers and business people all over the world who are involved in international trade.

The new rules are the fruit of three years of devoted work by ICC experts and National Committees, and a source of pride for all of us. Their preparation, benefiting all those engaged in international trade, is what the ICC is all about.

Jean-Charles Rouher
Secretary General of the ICC

# PREFACE

In November 1989, the International Chamber of Commerce Commission on Banking Technique and Practice authorised the revision of the Uniform Customs and Practice for Documentary Credits - Publication N°400.

This revision was required to address new developments in the transport industry and new technological applications. It is also intended to improve the functioning of the UCP. Some surveys indicate that approximately fifty per cent of the documents presented under the Documentary Credit are rejected because of discrepancies or apparent discrepancies. This disminishes the effectiveness of the Documentary Credit and can have a financial impact on those involved in the product. It may also increase the costs and reduce the profit margins of importers, exporters and banks. The marked increase in litigation involving Documentary Credits has also been of great concern.

To address these questions, the Commission on Banking Technique and Practice established a Working Group for the revision of the UCP 400. This group was composed of international bankers, law professors, and banking lawyers to ensure that all of these issues were thoroughly explored. The Working Group's mandate was to (1) simplify the UCP 400 Rules; (2) incorporate international banking practices, as well as to facilitate and standardise developing practices; (3) enhance the integrity and reliability of the Documentary Credit undertaking, through the presumption of irrevocability and clarification of the primary liability, not only of the issuing bank, but also of the confirming bank; (4) address the problems of non-documentary conditions and (5) list, in detail, the elements of acceptability for each category of transport document.

The Working Group considered not only the practice relative to the Documentary Credit, but also tried to envisage the future evolution of Documentary Credits. How should the Working Group predict what kind of Documentary Credit Rules would meet the future needs of international commerce? Should they be based on past performance using the existing Rules? Should they be based on correcting the current problems of misunderstanding and misapplying the Rules? Should they be based on the various international legal interpretations of Documentary Credits?

In the end, the Working Group's analysis was conducted by utilising various information sources available to the banking industry and the transport industry, and by drawing upon their own considerable knowledge of the technological innovations being applied in other industries engaged in international trade. In order to achieve general Rules, rather than specific procedural Rules, the Working Group adopted as its working draft a document based on ICC National Committees' practices, important international judicial decisions, the Banking Commission's opinions and decisions, and case studies examined over the last 20 years. Consequently, the new revision of the UCP represents the culmination of extensive analysis, review, debate, and compromise amongst the various members of the Working Group, the members of the Banking Commission and the respective National Committees of the ICC.

What were the individual contributions of the members of our Working Group that helped formulate these new UCP 500 Rules? Clearly, both in our individual and professional lives we learn more from year to year because we remember what we have learned and build up our knowledge and experience.

This was the strength that the members of the Working Group brought to the revision process. It allowed them to develop a neutral and living set of Rules to facilitate the efforts of the parties engaged in the Documentary Credit undertaking. Understandably, it is not within the scope of this publication to go into detail regarding the comprehensive analysis performed by the Working Group. Neither is it the purpose to argue the merits of what has been done. Those interested in pursuing the subject will find the ICC Publication N°511 - *Documentary Credits: UCP 500 and 400 Compared - An Article-by-Article Analysis* - available for this purpose.

Sincere thanks are due to the ICC National Committees and the members of the Banking Commission for their professional and constructive comments and their participative approach. Thanks are also due to those countries without National Committees (reached primarily through the United Nations Commission on International Trade Law) whose support and participation have been of great importance and value, as well as to other UN bodies concerned with the facilitation of international trade procedures.

To share with you the names of those participants, I list below in alphabetical order the members of the Working Group and their affiliation:

Boris Kozolchyk - Professor of Law, University of Arizona, Tucson, Arizona, U.S.A; Representative of the United States Council on International Banking Inc., New York, to the Working Group on the Revision of the UCP;

Salvatore Maccarone - Professor of Law, University of Rome; Legal Adviser, Italian Banking Association, Rome; Vice Chairman. ICC Commission on Banking Technique and Practice.

Terence J. Mitchell (now retired) - Senior Manager, Documentary Services, LLoyds Bank plc, London; British Bankers' Association Representative to the ICC Commission on Banking Technique and Practice;

Ferdinand Müller - First Vice President, Deutsche Bank AG, Frankfurt, Germany; Representative and Technical Adviser to the ICC Commission on Banking Technique and Practice;

Gunnar J. Siebke - Senior Vice President, Trade Finance, Christiania Bank. Oslo, Norway; Representative to the ICC Commission on Banking Technique and Practice;

Dan Taylor - President, United States Council on International Banking Inc., New York; Representative to the ICC Commission on Banking Technique and Practice;

Joachim G. Weichbrodt - Legal Adviser, Dresdner Bank AG, Frankfurt. Germany; Representative to the ICC Commission on Banking Technique and Practice;

Bernard S. Wheble CBE, Surrey, England - Honorary Chairman, ICC Commission on Banking Technique and Practice;

Stefan Draszczyk - Head of Division, International Chamber of Commerce, Paris, France.

The undersigned had the pleasure of chairing the Working Group.

It was through the generous contribution of their knowledge and time that this revision was accomplished so successfully. As Chairman of the ICC Commission on Banking Technique and Practice, I extend to them and to their institutions my deepest appreciation for their contribution, for a job well done and for their friendship. The ICC is grateful for their selfless commitment to this work.

Charles del Busto
Chairman
ICC Commission on Banking Technique and Practice
March 10, 1993

# CONTENTS

*Please note that the title or classification on the heading of each Article is for reference as to intent and purpose. It is not to be construed as being other than solely for the benefit or guidance and there should be no legal imputation.*

Page

| | |
|---|---|
| Foreword | 3 |
| Preface | 4 |

Article

**A. General Provisions and Definitions    10**

| | | |
|---|---|---|
| Application of UCP | 1 | 10 |
| Meaning of Credit | 2 | 10 |
| Credits v. Contracts | 3 | 11 |
| Documents v. Goods/Services/Performances | 4 | 11 |
| Instructions to Issue/Amend Credits | 5 | 11 |

**B. Form and Notification of Credits    12**

| | | |
|---|---|---|
| Revocable v. Irrevocable Credits | 6 | 12 |
| Advising Bank's Liability | 7 | 12 |
| Revocation of a Credit | 8 | 13 |
| Liability of Issuing and Confirming Banks | 9 | 13 |
| Types of Credit | 10 | 16 |
| Teletransmitted and Pre-Advised Credits | 11 | 17 |
| Incomplete or Unclear Instructions | 12 | 18 |

**C. Liabilities and Responsibilities    19**

| | | |
|---|---|---|
| Standard for Examination of Documents | 13 | 19 |
| Discrepant Documents and Notice | 14 | 19 |
| Disclaimer on Effectiveness of Documents | 15 | 21 |
| Disclaimer on the Transmission of Messages | 16 | 22 |
| Force Majeure | 17 | 22 |
| Disclaimer for Acts of an Instructed Party | 18 | 22 |
| Bank-to-Bank Reimbursement Arrangements | 19 | 23 |

**D. Documents    24**

| | | |
|---|---|---|
| Ambiguity as to the Issuers of Documents | 20 | 24 |
| Unspecified Issuers or Contents of Documents | 21 | 25 |

| | | |
|---|---|---|
| Issuance Date of Documents v. Credit Date | 22 | 25 |
| Marine/Ocean Bill of Lading | 23 | 26 |
| Non-Negotiable Sea Waybill | 24 | 29 |
| Charter Party Bill of Lading | 25 | 32 |
| Multimodal Transport Document | 26 | 33 |
| Air Transport Document | 27 | 35 |
| Road, Rail or Inland Waterway Transport Documents | 28 | 37 |
| Courier and Post Receipts | 29 | 38 |
| Transport Documents Issued by Freight Forwarders | 30 | 39 |
| «On Deck», «Shipper's Load and Count», Name of Consignor | 31 | 40 |
| Clean Transport Documents | 32 | 40 |
| Freight Payable/Prepaid Transport Documents | 33 | 41 |
| Insurance Documents | 34 | 42 |
| Type of Insurance Cover | 35 | 43 |
| All Risks Insurance Cover | 36 | 43 |
| Commercial Invoices | 37 | 44 |
| Other Documents | 38 | 44 |

**E. Miscellaneous Provisions    45**

| | | |
|---|---|---|
| Allowances in Credit Amount, Quantity and Unit Price | 39 | 45 |
| Partial Shipments/Drawings | 40 | 46 |
| Instalment Shipments/Drawings | 41 | 46 |
| Expiry Date and Place for Presentation of Documents | 42 | 46 |
| Limitation on the Expiry Date | 43 | 47 |
| Extension of Expiry Date | 44 | 47 |
| Hours of Presentation | 45 | 48 |
| General Expressions as to Dates for Shipment | 46 | 48 |
| Date Terminology for Periods of Shipment | 47 | 49 |

**F. Transferable Credit    49**

| | | |
|---|---|---|
| Transferable Credit | 48 | 49 |

**G. Assignment of Proceeds    52**

| | | |
|---|---|---|
| Assignment of Proceeds | 49 | 52 |

| | |
|---|---|
| The ICC at a glance | 54 |
| Selected ICC publications | 55 |

# A. General Provisions and Definitions

## Article 1

### Application of UCP

The Uniform Customs and Practice for Documentary Credits, 1993 Revision, ICC Publication N°500, shall apply to all Documentary Credits (including to the extent to which they may be applicable, Standby Letter(s) of Credit) where they are incorporated into the text of the Credit. They are binding on all parties thereto, unless otherwise expressly stipulated in the Credit.

## Article 2

### Meaning of Credit

For the purposes of these Articles, the expressions "Documentary Credit(s)" and "Standby Letter(s) of Credit" (hereinafter referred to as "Credit(s)"), mean any arrangement, however named or described, whereby a bank (the "Issuing Bank") acting at the request and on the instructions of a customer (the "Applicant") or on its own behalf,

    i.   is to make a payment to or to the order of a third party (the "Beneficiary"), or is to accept and pay bills of exchange (Draft(s)) drawn by the Beneficiary,

        or

    ii.  authorises another bank to effect such payment, or to accept and pay such bills of exchange (Draft(s)),

        or

    iii. authorises another bank to negotiate,

against stipulated document(s), provided that the terms and conditions of the Credit are complied with.

For the purposes of these Articles, branches of a bank in different countries are considered another bank.

## Article 3

### Credits v. Contracts

**a** Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the Credit. Consequently, the undertaking of a bank to pay, accept and pay Draft(s) or negotiate and/or to fulfil any other obligation under the Credit, is not subject to claims or defences by the Applicant resulting from his relationships with the Issuing Bank or the Beneficiary.

**b** A Beneficiary can in no case avail himself of the contractual relationships existing between the banks or between the Applicant and the Issuing Bank.

## Article 4

### Documents v. Goods/Services/Performances

In Credit operations all parties concerned deal with documents, and not with goods, services and/or other performances to which the documents may relate.

## Article 5

### Instructions to Issue/Amend Credits

**a** Instructions for the issuance of a Credit, the Credit itself, instructions for an amendment thereto, and the amendment itself, must be complete and precise.

In order to guard against confusion and misunderstanding, banks should discourage any attempt:

    i.   to include excessive detail in the Credit or in any amendment thereto;

    ii.  to give instructions to issue, advise or confirm a Credit by reference to a Credit previously

issued (similar Credit) where such previous Credit has been subject to accepted amendment(s), and/or unaccepted amendment(s).

**b** All instructions for the issuance of a Credit and the Credit itself and, where applicable, all instructions for an amendment thereto and the amendment itself, must state precisely the document(s) against which payment, acceptance or negotiation is to be made.

## B. Form and Notification of Credits

### Article 6

#### Revocable v. Irrevocable Credits

**a** A Credit may be either

   **i.**   revocable,

         or

   **ii.**   irrevocable.

**b** The Credit, therefore, should clearly indicate whether it is revocable or irrevocable.

**c** In the absence of such indication the Credit shall be deemed to be irrevocable.

### Article 7

#### Advising Bank's Liability

**a** A Credit may be advised to a Beneficiary through another bank (the "Advising Bank") without engagement on the part of the Advising Bank, but that bank, if it elects to advise the Credit, shall take reasonable care to check the apparent authenticity of the Credit which it advises. If the bank elects not to advise the Credit, it must so inform the Issuing Bank without delay.

**b** If the Advising Bank cannot establish such apparent authenticity it must inform, without delay, the bank from which the instructions appear to have been received that it has been unable to establish the authenticity of the Credit and if it elects nonetheless to advise the Credit it must inform the Beneficiary that it has not been able to establish the authenticity of the Credit.

### Article 8

#### Revocation of a Credit

**a** A revocable Credit may be amended or cancelled by the Issuing Bank at any moment and without prior notice to the Beneficiary.

**b** However, the Issuing Bank must:

   **i.**   reimburse another bank with which a revocable Credit has been made available for sight payment, acceptance or negotiation - for any payment, acceptance or negotiation made by such bank - prior to receipt by it of notice of amendment or cancellation, against documents which appear on their face to be in compliance with the terms and conditions of the Credit;

   **ii.**   reimburse another bank with which a revocable Credit has been made available for deferred payment, if such a bank has, prior to receipt by it of notice of amendment or cancellation, taken up documents which appear on their face to be in compliance with the terms and conditions of the Credit.

### Article 9

#### Liability of Issuing and Confirming Banks

**a** An irrevocable Credit constitutes a definite undertaking of the Issuing Bank, provided that the stipulated documents are presented to the Nominated Bank or to the Issuing Bank and that the terms and conditions of the Credit are complied with:

**i.** if the Credit provides for sight payment - to pay at sight;

**ii.** if the Credit provides for deferred payment - to pay on the maturity date(s) determinable in accordance with the stipulations of the Credit;

**iii.** if the Credit provides for acceptance:

**a.** by the Issuing Bank - to accept Draft(s) drawn by the Beneficiary on the Issuing Bank and pay them at maturity,

or

**b.** by another drawee bank - to accept and pay at maturity Draft(s) drawn by the Beneficiary on the Issuing Bank in the event the drawee bank stipulated in the Credit does not accept Draft(s) drawn on it, or to pay Draft(s) accepted but not paid by such drawee bank at maturity;

**iv.** if the Credit provides for negotiation - to pay without recourse to drawers and/or bona fide holders, Draft(s) drawn by the Beneficiary and/or document(s) presented under the Credit. A Credit should not be issued available by Draft(s) on the Applicant. If the Credit nevertheless calls for Draft(s) on the Applicant, banks will consider such Draft(s) as an additional document(s).

---

**b** A confirmation of an irrevocable Credit by another bank (the "Confirming Bank") upon the authorisation or request of the Issuing Bank, constitutes a definite undertaking of the Confirming Bank, in addition to that of the Issuing Bank, provided that the stipulated documents are presented to the Confirming Bank or to any other Nominated Bank and that the terms and conditions of the Credit are complied with:

**i.** if the Credit provides for sight payment - to pay at sight;

**ii.** if the Credit provides for deferred payment - to pay on the maturity date(s) determinable in accordance with the stipulations of the Credit;

**iii.** if the Credit provides for acceptance:

**a.** by the Confirming Bank - to accept Draft(s) drawn by the Beneficiary on the Confirming Bank and pay them at maturity,

or

**b.** by another drawee bank - to accept and pay at maturity Draft(s) drawn by the Beneficiary on the Confirming Bank, in the event the drawee bank stipulated in the Credit does not accept Draft(s) drawn on it, or to pay Draft(s) accepted but not paid by such drawee bank at maturity;

**iv.** if the Credit provides for negotiation - to negotiate without recourse to drawers and/or bona fide holders, Draft(s) drawn by the Beneficiary and/or document(s) presented under the Credit. A Credit should not be issued available by Draft(s) on the Applicant. If the Credit nevertheless calls for Draft(s) on the Applicant, banks will consider such Draft(s) as an additional document(s).

---

**c** **i.** If another bank is authorised or requested by the Issuing Bank to add its confirmation to a Credit but is not prepared to do so, it must so inform the Issuing Bank without delay.

**ii.** Unless the Issuing Bank specifies otherwise in its authorisation or request to add confirmation, the Advising Bank may advise the Credit to the Beneficiary without adding its confirmation.

---

**d** **i.** Except as otherwise provided by Article 48, an irrevocable Credit can neither be amended nor cancelled without the agreement of the Issuing Bank, the Confirming Bank, if any, and the Beneficiary.

**ii.** The Issuing Bank shall be irrevocably bound by an amendment(s) issued by it from the time of the issuance of such amendment(s). A Confirming Bank may extend its confirmation to an amendment and shall be irrevocably bound

as of the time of its advice of the amendment. A Confirming Bank may, however, choose to advise an amendment to the Beneficiary without extending its confirmation and if so, must inform the Issuing Bank and the Beneficiary without delay.

**iii.** The terms of the original Credit (or a Credit incorporating previously accepted amendment(s)) will remain in force for the Beneficiary until the Beneficiary communicates his acceptance of the amendment to the bank that advised such amendment. The Beneficiary should give notification of acceptance or rejection of amendment(s). If the Beneficiary fails to give such notification, the tender of documents to the Nominated Bank or Issuing Bank, that conform to the Credit and to not yet accepted amendment(s), will be deemed to be notification of acceptance by the Beneficiary of such amendment(s) and as of that moment the Credit will be amended.

**iv.** Partial acceptance of amendments contained in one and the same advice of amendment is not allowed and consequently will not be given any effect.

## Article 10

### Types of Credit

**a** All Credits must clearly indicate whether they are available by sight payment, by deferred payment, by acceptance or by negotiation.

**b** **i.** Unless the Credit stipulates that it is available only with the Issuing Bank, all Credits must nominate the bank (the "Nominated Bank") which is authorised to pay, to incur a deferred payment undertaking, to accept Draft(s) or to negotiate. In a freely negotiable Credit, any bank is a Nominated Bank.

Presentation of documents must be made to the Issuing Bank or the Confirming Bank, if any, or any other Nominated Bank.

**ii.** Negotiation means the giving of value for Draft(s) and/or document(s) by the bank authorised to negotiate. Mere examination of the documents without giving of value does not constitute a negotiation.

**c** Unless the Nominated Bank is the Confirming Bank, nomination by the Issuing Bank does not constitute any undertaking by the Nominated Bank to pay, to incur a deferred payment undertaking, to accept Draft(s), or to negotiate. Except where expressly agreed to by the Nominated Bank and so communicated to the Beneficiary, the Nominated Bank's receipt of and/or examination and/or forwarding of the documents does not make that bank liable to pay, to incur a deferred payment undertaking, to accept Draft(s), or to negotiate.

**d** By nominating another bank, or by allowing for negotiation by any bank, or by authorising or requesting another bank to add its confirmation, the Issuing Bank authorises such bank to pay, accept Draft(s) or negotiate as the case may be, against documents which appear on their face to be in compliance with the terms and conditions of the Credit and undertakes to reimburse such bank in accordance with the provisions of these Articles.

## Article 11

### Teletransmitted and Pre-Advised Credits

**a** **i.** When an Issuing Bank instructs an Advising Bank by an authenticated teletransmission to advise a Credit or an amendment to a Credit, the teletransmission will be deemed to be the operative Credit instrument or the operative amendment, and no mail confirmation should be sent. Should a mail confirmation nevertheless be sent, it will have no effect and the Advising Bank will have no obligation to check such mail confirmation against the operative Credit instrument or the operative amendment received by teletransmission.

**ii.** If the teletransmission states "full details to follow" (or words of similar effect) or states that the mail confirmation is to be the operative Credit instrument or the operative amendment, then the teletransmission will not be deemed to be the operative Credit instrument or the operative amendment. The Issuing Bank must forward the operative Credit instrument or the operative amendment to such Advising Bank without delay.

**b** If a bank uses the services of an Advising Bank to have the Credit advised to the Beneficiary, it must also use the services of the same bank for advising an amendment(s).

**c** A preliminary advice of the issuance or amendment of an irrevocable Credit (pre-advice), shall only be given by an Issuing Bank if such bank is prepared to issue the operative Credit instrument or the operative amendment thereto. Unless otherwise stated in such preliminary advice by the Issuing Bank, an Issuing Bank having given such pre-advice shall be irrevocably committed to issue or amend the Credit, in terms not inconsistent with the pre-advice, without delay.

## Article 12

### Incomplete or Unclear Instructions

If incomplete or unclear instructions are received to advise, confirm or amend a Credit, the bank requested to act on such instructions may give preliminary notification to the Beneficiary for information only and without responsibility. This preliminary notification should state clearly that the notification is provided for information only and without the responsibility of the Advising Bank. In any event, the Advising Bank must inform the Issuing Bank of the action taken and request it to provide the necessary information.

The Issuing Bank must provide the necessary information without delay. The Credit will be advised, confirmed or amended, only when complete and clear instructions have been received and if the Advising Bank is then prepared to act on the instructions.

## C. Liabilities and Responsibilities

## Article 13

### Standard for Examination of Documents

**a** Banks must examine all documents stipulated in the Credit with reasonable care, to ascertain whether or not they appear, on their face, to be in compliance with the terms and conditions of the Credit. Compliance of the stipulated documents on their face with the terms and conditions of the Credit, shall be determined by international standard banking practice as reflected in these Articles. Documents which appear on their face to be inconsistent with one another will be considered as not appearing on their face to be in compliance with the terms and conditions of the Credit.

Documents not stipulated in the Credit will not be examined by banks. If they receive such documents, they shall return them to the presenter or pass them on without responsibility.

**b** The Issuing Bank, the Confirming Bank, if any, or a Nominated Bank acting on their behalf, shall each have a reasonable time, not to exceed seven banking days following the day of receipt of the documents, to examine the documents and determine whether to take up or refuse the documents and to inform the party from which it received the documents accordingly.

**c** If a Credit contains conditions without stating the document(s) to be presented in compliance therewith, banks will deem such conditions as not stated and will disregard them.

## Article 14

### Discrepant Documents and Notice

**a** When the Issuing Bank authorises another bank to pay, incur a deferred payment undertaking, accept Draft(s), or negotiate against documents which

appear on their face to be in compliance with the terms and conditions of the Credit, the Issuing Bank and the Confirming Bank, if any, are bound:

**i.** to reimburse the Nominated Bank which has paid, incurred a deferred payment undertaking, accepted Draft(s), or negotiated,

**ii.** to take up the documents.

**b** Upon receipt of the documents the Issuing Bank and /or Confirming Bank, if any, or a Nominated Bank acting on their behalf, must determine on the basis of the documents alone whether or not they appear on their face to be in compliance with the terms and conditions of the Credit. If the documents appear on their face not to be in compliance with the terms and conditions of the Credit, such banks may refuse to take up the documents.

**c** If the Issuing Bank determines that the documents appear on their face not to be in compliance with the terms and conditions of the Credit, it may in its sole judgment approach the Applicant for a waiver of the discrepancy(ies). This does not, however, extend the period mentioned in sub-Article 13 (b).

**d** **i.** If the Issuing Bank and/or Confirming Bank, if any, or a Nominated Bank acting on their behalf, decides to refuse the documents, it must give notice to that effect by telecommunication or, if that is not possible, by other expeditious means, without delay but no later than the close of the seventh banking day following the day of receipt of the documents. Such notice shall be given to the bank from which it received the documents, or to the Beneficiary, if it received the documents directly from him.

**ii.** Such notice must state all discrepancies in respect of which the bank refuses the documents and must also state whether it is holding the documents at the disposal of, or is returning them to, the presenter.

**iii.** The Issuing Bank and/or Confirming Bank, if

any, shall then be entitled to claim from the remitting bank refund, with interest, of any reimbursement which has been made to that bank.

**e** If the Issuing Bank and/or Confirming Bank, if any, fails to act in accordance with the provisions of this Article and/or fails to hold the documents at the disposal of, or return them to the presenter, the Issuing Bank and/or Confirming Bank, if any, shall be precluded from claiming that the documents are not in compliance with the terms and conditions of the Credit.

**f** If the remitting bank draws the attention of the Issuing Bank and/or Confirming Bank, if any, to any discrepancy(ies) in the document(s) or advises such banks that it has paid, incurred a deferred payment undertaking, accepted Draft(s) or negotiated under reserve or against an indemnity in respect of such discrepancy(ies), the Issuing Bank and/or Confirming Bank, if any, shall not be thereby relieved from any of their obligations under any provision of this Article. Such reserve or indemnity concerns only the relations between the remitting bank and the party towards whom the reserve was made, or from whom, or on whose behalf, the indemnity was obtained.

## Article 15

### Disclaimer on Effectiveness of Documents

Banks assume no liability or responsibility for the form, sufficiency, accuracy, genuineness, falsification or legal effect of any document(s), or for the general and/or particular conditions stipulated in the document(s) or superimposed thereon; nor do they assume any liability or responsibility for the description, quantity, weight, quality, condition, packing, delivery, value or existence of the goods represented by any document(s), or for the good faith or acts and/or omissions, solvency, performance or standing of the consignors, the carriers, the forwarders, the consignees or the insurers of the goods, or any other person whomsoever.

## Article 16

### Disclaimer on the Transmission of Messages

Banks assume no liability or responsibility for the consequences arising out of delay and/or loss in transit of any message(s), letter(s) or document(s), or for delay, mutilation or other error(s) arising in the transmission of any telecommunication. Banks assume no liability or responsibility for errors in translation and/or interpretation of technical terms, and reserve the right to transmit Credit terms without translating them.

## Article 17

### Force Majeure

Banks assume no liability or responsibility for the consequences arising out of the interruption of their business by Acts of God, riots, civil commotions, insurrections, wars or any other causes beyond their control, or by any strikes or lockouts. Unless specifically authorised, banks will not, upon resumption of their business, pay, incur a deferred payment undertaking, accept Draft(s) or negotiate under Credits which expired during such interruption of their business.

## Article 18

### Disclaimer for Acts of an Instructed Party

**a** Banks utilizing the services of another bank or other banks for the purpose of giving effect to the instructions of the Applicant do so for the account and at the risk of such Applicant.

**b** Banks assume no liability or responsibility should the instructions they transmit not be carried out, even if they have themselves taken the initiative in the choice of such other bank(s).

**c** **i.** A party instructing another party to perform services is liable for any charges, including commissions, fees, costs or expenses incurred by the instructed party in connection with its instructions.

**ii.** Where a Credit stipulates that such charges are for the account of a party other than the instructing party, and charges cannot be collected, the instructing party remains ultimately liable for the payment thereof.

**d** The Applicant shall be bound by and liable to indemnify the banks against all obligations and responsibilities imposed by foreign laws and usages.

## Article 19

### Bank-to-Bank Reimbursement Arrangements

**a** If an Issuing Bank intends that the reimbursement to which a paying, accepting or negotiating bank is entitled, shall be obtained by such bank (the "Claiming Bank"), claiming on another party (the "Reimbursing Bank"), it shall provide such Reimbursing Bank in good time with the proper instructions or authorisation to honour such reimbursement claims.

**b** Issuing Banks shall not require a Claiming Bank to supply a certificate of compliance with the terms and conditions of the Credit to the Reimbursing Bank.

**c** An Issuing Bank shall not be relieved from any of its obligations to provide reimbursement if and when reimbursement is not received by the Claiming Bank from the Reimbursing Bank.

**d** The Issuing Bank shall be responsible to the Claiming Bank for any loss of interest if reimbursement is not provided by the Reimbursing Bank on first demand, or as otherwise specified in the Credit, or mutually agreed, as the case may be.

**e** The Reimbursing Bank's charges should be for the account of the Issuing Bank. However, in cases where the charges are for the account of another party, it is the responsibility of the Issuing Bank to so indicate in the original Credit and in the reimbursement authorisation. In cases where the

Reimbursing Bank's charges are for the account of another party they shall be collected from the Claiming Bank when the Credit is drawn under. In cases where the Credit is not drawn under, the Reimbursing Bank's charges remain the obligation of the Issuing Bank.

# D. Documents

## Article 20

### Ambiguity as to the Issuers of Documents

**a** Terms such as "first class", "well known", "qualified", "independent", "official", "competent", "local" and the like, shall not be used to describe the issuers of any document(s) to be presented under a Credit. If such terms are incorporated in the Credit, banks will accept the relative document(s) as presented, provided that it appears on its face to be in compliance with the other terms and conditions of the Credit and not to have been issued by the Beneficiary.

**b** Unless otherwise stipulated in the Credit, banks will also accept as an original document(s), a document(s) produced or appearing to have been produced:

**i.** by reprographic, automated or computerized systems;

**ii.** as carbon copies;

provided that it is marked as original and, where necessary, appears to be signed.

A document may be signed by handwriting, by facsimile signature, by perforated signature, by stamp, by symbol, or by any other mechanical or electronic method of authentication.

**c** **i.** Unless otherwise stipulated in the Credit, banks will accept as a copy(ies), a document(s) either

labelled copy or not marked as an original - a copy(ies) need not be signed.

**ii.** Credits that require multiple document(s) such as "duplicate", "two fold", "two copies" and the like, will be satisfied by the presentation of one original and the remaining number in copies except where the document itself indicates otherwise.

**d** Unless otherwise stipulated in the Credit, a condition under a Credit calling for a document to be authenticated, validated, legalised, visaed, certified or indicating a similar requirement, will be satisfied by any signature, mark, stamp or label on such document that on its face appears to satisfy the above condition.

## Article 21

### Unspecified Issuers or Contents of Documents

When documents other than transport documents, insurance documents and commercial invoices are called for, the Credit should stipulate by whom such documents are to be issued and their wording or data content. If the Credit does not so stipulate, banks will accept such documents as presented, provided that their data content is not inconsistent with any other stipulated document presented.

## Article 22

### Issuance Date of Documents v. Credit Date

Unless otherwise stipulated in the Credit, banks will accept a document bearing a date of issuance prior to that of the Credit, subject to such document being presented within the time limits set out in the Credit and in these Articles.

## Article 23

## Marine/Ocean Bill of Lading

**a** If a Credit calls for a bill of lading covering a port-to-port shipment, banks will, unless otherwise stipulated in the Credit, accept a document, however named, which:

i. appears on its face to indicate the name of the carrier and to have been signed or otherwise authenticated by:

- the carrier or a named agent for or on behalf of the carrier, or

- the master or a named agent for or on behalf of the master.

Any signature or authentication of the carrier or master must be identified as carrier or master, as the case may be. An agent signing or authenticating for the carrier or master must also indicate the name and the capacity of the party, i.e. carrier or master, on whose behalf that agent is acting,

and

ii. indicates that the goods have been loaded on board, or shipped on a named vessel.

Loading on board or shipment on a named vessel may be indicated by pre-printed wording on the bill of lading that the goods have been loaded on board a named vessel or shipped on a named vessel, in which case the date of issuance of the bill of lading will be deemed to be the date of loading on board and the date of shipment.

In all other cases loading on board a named vessel must be evidenced by a notation on the bill of lading which gives the date on which the goods have been loaded on board, in which case the date of the on board notation will be deemed to be the date of shipment.

If the bill of lading contains the indication "intended vessel", or similar qualification in relation to the vessel, loading on board a named vessel must be evidenced by an on board notation on the bill of lading which, in addition to the date on which the goods have been loaded on board, also includes the name of the vessel on which the goods have been loaded, even if they have been loaded on the vessel named as the "intended vessel".

If the bill of lading indicates a place of receipt or taking in charge different from the port of loading, the on board notation must also include the port of loading stipulated in the Credit and the name of the vessel on which the goods have been loaded, even if they have been loaded on the vessel named in the bill of lading. This provision also applies whenever loading on board the vessel is indicated by pre-printed wording on the bill of lading,

and

iii. indicates the port of loading and the port of discharge stipulated in the Credit, notwithstanding that it:

a. indicates a place of taking in charge different from the port of loading, and/or a place of final destination different from the port of discharge,

and/or

b. contains the indication "intended" or similar qualification in relation to the port of loading and/or port of discharge, as long as the document also states the ports of loading and/or discharge stipulated in the Credit,

and

iv. consists of a sole original bill of lading or, if issued in more than one original, the full set as so issued,

and

# EXHIBIT I

*ICC Banking Commission.*

# International Standby Practices

# ISP98

in force as of 1 January 1999

LOS ANGELES COUNTY LAW LIBRARY

**The International Standby Practices – ISP98**
were approved by the ICC Commission on Banking Technique and Practice on 6 April 1998. They are being issued as ICC publication N°590.

The English language edition is the official text of the ISP98. Official translations will be approved by the Institute of International Banking Law & Practice, Inc. and available from ICC Publishing or ICC National Committees.

*K81*
*I23*
*1998*
*c.2*

First published in this format in October 1998 by
**ICC Publishing SA** (Paris) and
**ICC Publishing, Inc.** (New York)

Copyright ©1998
**The Institute of International Banking Law & Practice, Inc.**

*All rights reserved. No part of this work may be reproduced or copied, in any form or by any means – graphic, electronic or mechanical, including recording taping or information retrieval systems – without the written permission of ICC Publishing SA, or ICC Publishing, Inc. for the USA, or of the Institute of International Banking Law and Practice, Inc.*

**ICC Publication N° 590**
ISBN 92.842.1247.2

# FOREWORD
*By Maria Livanos Cattaui, Secretary General of ICC*

I take great pleasure in introducing the publication of the International Standby Practices by the ICC.

ISP98 embodies the commitment of ICC, through its Commission on Banking Technique and Practice, to provide global leadership in the formulation of standard banking practice for letters of credit and related independent undertakings such as standby letters of credit. In the tradition of ICC's *Uniform Customs and Practice for Documentary Credits* (UCP), which is recognized worldwide as the code of practice governing commercial letters of credit, endorsement of the ISP98 by ICC assures that these rules will assume a global character as well.

As standbys came into their own under the UCP, it nevertheless became clear that issues of practice had emerged which required different solutions than those provided by the UCP. ISP98, in a sense, is an evolutionary product of the application of the UCP to standbys, as can be seen in the similarities between the two sets of rules. It is important to note that standbys can still be issued subject to UCP, if the parties determine it is their wish to do so.

It is also significant that ICC has joined hands with the Institute of International Banking Law and Practice in the development of ISP98. The rules, originally developed over several years by the Institute and all segments of the international standby community, benefited from the input of an ICC Working Party, chaired by the Banking Commission's Technical Adviser, Gary Collyer, which reviewed and made suggestions concerning the rules during the last several months of their development. The result, we are pleased to say, reflects many of ICC's concerns and represents the output of a productive partnership formed to provide a workable and realistic set of rules for the users of standbys worldwide.

# CONTENTS

FOREWORD ................................................................ 3

PREFACE ................................................................... 5

PROLOGUE ............................................................. 11

RULE 1: General Provisions ..................................... 13

RULE 2: Obligations ................................................ 22

RULE 3: Presentation ............................................. 26

RULE 4: Examination .............................................. 33

RULE 5: Notice, Preclusion, and Disposition
         of Documents ........................................... 41

RULE 6: Transfer, Assignment, and Transfer
         by Operation of Law ............................... 45

RULE 7: Cancellation ............................................. 51

RULE 8: Reimbursement Obligations .................... 52

RULE 9: Timing .................................................... 54

RULE 10: Syndication / Participation ...................... 55


APPENDICES
        Index ...................................................... 56
        Acknowledgments ................................... 69
        The ICC at a glance ................................ 70
        Selected ICC publications ....................... 71
        Institute of International Banking Law
        and Practice, Inc. .................................... 74

# PREFACE

The International Standby Practices (ISP98) reflects generally accepted practice, custom, and usage of standby letters of credit. It provides separate rules for standby letters of credit in the same sense that the Uniform Customs and Practice for Documentary Credits (UCP) and the Uniform Rules for Demand Guarantees (URDG) do for commercial letters of credit and independent bank guarantees.

The formulation of standby letter of credit practices in separate rules evidences the maturity and importance of this financial product. The amounts outstanding of standbys greatly exceed the outstanding amounts of commercial letters of credit. While the standby is associated with the United States where it originated and where it is most widely used, it is truly an international product. Non-U.S. bank outstandings have exceeded those of U.S. banks in the United States alone. Moreover, the standby is used increasingly throughout the world.

Standbys are issued to support payment, when due or after default, of obligations based on money loaned or advanced, or upon the occurrence or non-occurrence of another contingency.

For convenience, standbys are commonly classified descriptively (and without operative significance in the application of these Rules) based on their function in the underlying transaction or other factors not necessarily related to the terms and conditions of the standby itself. For example:

• A "Performance Standby" supports an obligation to perform other than to pay money including for the purpose of covering losses arising from a default of the applicant in completion of the underlying transactions.

• An "Advance Payment Standby" supports an obligation to account for an advance payment made by the beneficiary to the applicant.

- A "Bid Bond/Tender Bond Standby" supports an obligation of the applicant to execute a contract if the applicant is awarded a bid.

- A "Counter Standby" supports the issuance of a separate standby or other undertaking by the beneficiary of the counter standby.

- A "Financial Standby" supports an obligation to pay money, including any instrument evidencing an obligation to repay borrowed money.

- A "Direct Pay Standby" supports payment when due of an underlying payment obligation typically in connection with a financial standby without regard to a default.

- An "Insurance Standby" supports an insurance or reinsurance obligation of the applicant.

- A "Commercial Standby" supports the obligations of an applicant to pay for goods or services in the event of non-payment by other methods.

In the past, many standbys have been issued subject to the UCP even though it was intended for commercial letters of credit. The UCP reinforced the independence and documentary character of the standby. It also provided standards for examination and notice of dishonor and a basis to resist market pressures to embrace troublesome practices such as the issuance of standbys without expiration dates.

Despite these important contributions, it has long been apparent that the UCP was not fully applicable nor appropriate for standbys, as is recognized in UCP 500 Article 1 which provides that it applies to the extent to which they may be applicable. Even the least complex standbys (those calling for presentation of a draft only) pose problems not addressed by the UCP. More complex standbys (those involving longer terms or automatic extensions, transfer on demand, requests that the beneficiary issue its own undertaking to another, and the like) require more specialized rules of practice. The ISP fills these needs.

The ISP differs from the UCP in style and approach because it must receive acceptance not only from bankers and merchants, but also from a broader range of those actively involved in standby law and practice corporate treasurers and credit managers, rating agencies, government agencies and regulators, and indenture trustees as well as their counsel. Because standbys are often intended to be available in the event of disputes or applicant insolvency, their texts are subject to a degree of scrutiny not encountered in the commercial letter of credit context. As a result, the ISP is also written to provide guidance to lawyers and judges in the interpretation of standby practice.

Differences in substance result either from different practices, different problems, or the need for more precision. In addition, the ISP proposes basic definitions should the standby permit or require presentation of documents by electronic means. Since standbys infrequently require presentation of negotiable documents, standby practice is currently more conducive to electronic presentations, and the ISP provides definitions and rules encouraging such presentations. The development of S.W.I.F.T. message types for the ISP is anticipated.

The ISP, like the UCP for commercial letters of credit, simplifies, standardizes, and streamlines the drafting of standbys, and provides clear and widely accepted answers to common problems. There are basic similarities with the UCP because standby and commercial practices are fundamentally the same. Even where the rules overlap, however, the ISP is more precise, stating the intent implied in the UCP rule, in order to make the standby more dependable when a drawing or honor is questioned.

Like the UCP and the URDG, the ISP will apply to any independent undertaking issued subject to it. This approach avoids the impractical and often impossible task of identifying and distinguishing standbys from independent guarantees and, in many cases, commercial letters of credit. The choice of which set of rules to select is, therefore, left to the parties as it should be. One may well choose to use the ISP for certain types of standbys, the UCP for others, and the URDG for still others. While the ISP is not intended to be used for

dependent undertakings such as accessory guarantees and insurance contracts, it may be useful in some situations in indicating that a particular undertaking which might otherwise be treated as dependent under local law is intended to be independent.

For the ISP to apply to a standby, an undertaking should be made subject to these Rules by including language such as (but not limited to):

- This undertaking is issued subject to the International Standby Practices 1998.

or

- Subject to ISP98.

Although the ISP can be varied by the text of a standby, it provides neutral rules acceptable in the majority of situations and a useful starting point for negotiations in other situations. It will save parties (including banks that issue, confirm, or are beneficiaries of standbys) considerable time and expense in negotiating and drafting standby terms.

The ISP is designed to be compatible with the United Nations Convention on Independent Guarantees and Stand-by Letters of Credit (which represents a useful and practical formulation of basic standby and independent guarantee law) and also with local law, whether statutory or judicial, and to embody standby letter of credit practice under that law. If these rules conflict with mandatory law on issues such as assignment of proceeds or transfer by operation of law, applicable law will, of course, control. Nonetheless, most of these issues are rarely addressed in local law and progressive commercial law will often look to the practice as recorded in the ISP for guidance in such situations, especially with respect to cross border under-takings. As a result, it is expected that the ISP will complement local law rather than conflict with it.

The ISP is intended to be used also in arbitration as well as judicial proceedings (such as the expert based letter of credit arbitration system developed by the International Center for Letter of Credit Arbitration (ICLOCA) Rules or general commercial ICC arbitration) or with alternative methods of dispute resolution. Such a choice should be made expressly and with appropriate detail. At a minimum, it can be made in connection with the clause relating to ISP98 - e.g. This undertaking is issued subject to ISP98, and all disputes arising out of it or related to it are subject to arbitration under ICLOCA Rules (1996).

Although translations of the ISP into other languages are envisioned and will be monitored for integrity, the English text is the official text of the ISP in the event of disputes.

The ISP is the product of the work of the ISP Working Group under the auspices of the Institute of International Banking Law & Practice, Inc. which interacted with hundreds of persons over a five year period, and has benefitted from comments received from individuals, banks, and national and international associations. In particular, the participation of the International Financial Services Association (formerly the USCIB) and the Ad Hoc Working Group under the chairmanship of Gary Collyer (which led to its endorsement by the ICC Banking Commission) is gratefully recognized. In addition, the sponsorship and support of Citibank N.A., The Chase Manhattan Bank, ABN-AMRO, Baker & McKenzie, and the National Law Center for Inter-American Free Trade is acknowledged. Perhaps the greatest significance of the ISP is that its creation marks a new chapter in the collaboration between the international banking operations community and the legal community at an international level. In this respect, the active role played in this process by the Secretariat of the United Nations Commission on International Trade Law has been invaluable.

The ISP is drafted as a set of rules intended for use in daily practice. It is not intended to provide introductory information on standbys and their uses. While it is recognized that specific rules would benefit from explanatory comments, such comments are not appended to the ISP because the resulting work would be too cumbersome for daily use. Instead, introductory materials and Official Comments are available in the *Official Commentary on the International Standby Practices (ISP98)*. For further information on support materials and developments on the ISP and to pose queries, consult the ISP98 website: www.ISP98.com.

To address inevitable questions, to provide for official interpretation of the rules, and to assure their proper evolution, the Institute of International Banking Law & Practice, Inc. has created a Council on International Standby Practices which is representative of the several constituencies which have contributed to the ISP and has charged it with the task of maintaining the integrity of the ISP in cooperation with the Institute, the ICC Banking Commission, the IFSA, and various supporting organizations.

Professor James E. Byrne
Director,
Institute of International Banking Law & Practice, Inc.;
Chair & Reporter,
ISP Working Group

James G. Barnes
Baker & McKenzie;
Vice Chair,
ISP Working Group

Gary W. Collyer
Vice President,
Citibank, N.A;
Chair,
ICC Ad Hoc Working Group &
Technical Adviser to the ICC Banking Commission

# PROLOGUE

*by Dr. Gerold Herrmann, Secretary, United Nations Commission on International Trade Law (UNCITRAL)*

It was an extremely interesting and enriching experience for me to assist in drafting ISP98. This participation allowed me to witness (and now bear witness to) the very thorough and pragmatic drafting process in a superbly selected group, with representatives of all interested sectors actively involved in standby letter of credit practice such as: bankers, especially those responsible for letter of credit operations and global trade transactions, bank counsel, attorneys, academics, regulators, government officials, corporate treasurers, and likely influential beneficiaries. The treasure trove of experience and expertise and the diversity of interests and perspectives proved invaluable in determining— as was continuously done by examining concrete practical examples— whether on a given issue an operational rule would be desirable and useful and, if so, which solution would work best and reflect good practice.

Continued participation in the preparatory work has also convinced me— as, I am sure, it would have anyone else— of the special characteristics of standbys at the operational level of practical detail and usage. Their special features, in my view, not only justify but also necessitate special contractual rules designed for standbys. As the constant comparison with the UCP clearly revealed, quite a few UCP Articles are inappropriate for standbys and quite a few issues of paramount importance in standby practice are not addressed at all in the UCP. While a similar disparity in practice exists between the standby and the independent guarantee (the bank or demand guarantee European style), this seems particularly, if not exclusively, true for those types of actual use (e.g. financial standby, direct-pay standby) hitherto found only extremely rarely in guarantee practice. For this and other reasons, including firmness of the undertaking, I would not be surprised to see not only standbys but also some demand guarantees issued subject to ISP98.

For a professional unifier of law, participation in the preparatory work was particularly satisfying because of its interconnection with other harmonisation and reform efforts. In addition to the concordance with revised Article 5 UCC (the letter-of-credit law of the homeland of the standby) and the similarly close contact (and personal overlap) with the 1993 UCP revision task force, I am referring in particular to UNCITRAL's work which culminated in the adoption in 1995 by the General Assembly of the "United Nations Convention on Independent Guarantees and Stand-by Letters of Credit." The idea of preparing special operational rules for standbys was born during the extensive debates comparing national laws as well as the two instruments to be married by that Convention. Since bride and groom were presented there in all facets and critically scrutinized by their future in-laws, UNCITRAL's *travaux preparatoires* make for highly informative reading (as will future abstracts of court decisions to be published in UNCITRAL's case collection system called CLOUT; homepage: www.un.or.at/uncitral). It was gratifying to see the group preparing ISP98 refer continuously to the UNCITRAL Convention in order to ensure complete consistency. I must admit to special gratification by overhearing one of the world's leading letter of credit expert's remark to his banking colleague: "The more I look at this UN Convention, the more I really like it."

The above coordination or cooperation in the universal harmonisation and modernization efforts is welcome and in fact crucial because of the (often neglected or ignored) interdependence between the two very different levels of legal norms: the contractual level, where such sets of rules like ISP98, UCP 500, or URDG become effective by agreement of the individual parties, and the statutory level, where internationally elaborated law like the UN Convention or domestic law (e.g. Art. 5 UCC) recognise and give full effect to the exercise of that party autonomy and regulate certain issues that can effectively be settled only at that level (e.g. standards of fraud exception, injunctive relief and other court matters). Therefore, ISP98 and the Convention supplement each other in an ideal manner and together lay the necessary basis for a smooth functioning of standby practice worldwide.

## RULE 1

### GENERAL PROVISIONS

#### Scope, Application, Definitions, and Interpretation of These Rules

**1.01   Scope and Application**

  **a.** These Rules are intended to be applied to standby letters of credit (including performance, financial, and direct pay standby letters of credit).

  **b.** A standby letter of credit or other similar undertaking, however named or described, whether for domestic or international use, may be made subject to these Rules by express reference to them.

  **c.** An undertaking subject to these Rules may expressly modify or exclude their application.

  **d.** An undertaking subject to these Rules is hereinafter referred to as a **"standby"**.

**1.02   Relationship to Law and Other Rules**

  **a.** These Rules supplement the applicable law to the extent not prohibited by that law.

  **b.** These Rules supersede conflicting provisions in any other rules of practice to which a standby letter of credit is also made subject.

**1.03   Interpretative Principles**

  These Rules shall be interpreted as mercantile usage with regard for:

  **a.** integrity of standbys as reliable and efficient undertakings to pay;

  **b.** practice and terminology of banks and businesses in day-to-day transactions;

**c.** consistency within the worldwide system of banking operations and commerce; and

**d.** worldwide uniformity in their interpretation and application.

### 1.04 Effect of the Rules

Unless the context otherwise requires, or unless expressly modified or excluded, these Rules apply as terms and conditions incorporated into a standby, confirmation, advice, nomination, amendment, transfer, request for issuance, or other agreement of:

i. the issuer;

ii. the beneficiary to the extent it uses the standby;

iii. any advisor;

iv. any confirmer;

v. any person nominated in the standby who acts or agrees to act; and

vi. the applicant who authorises issuance of the standby or otherwise agrees to the application of these Rules.

### 1.05 Exclusion of Matters Related to Due Issuance and Fraudulent or Abusive Drawing

These Rules do not define or otherwise provide for:

**a.** power or authority to issue a standby;

**b.** formal requirements for execution of a standby (e.g. a signed writing); or

**c.** defenses to honour based on fraud, abuse, or similar matters.

These matters are left to applicable law.

---

### General Principles

### 1.06 Nature of Standbys

**a.** A standby is an irrevocable, independent, documentary, and binding undertaking when issued and need not so state.

**b.** Because a standby is irrevocable, an issuer's obligations under a standby cannot be amended or cancelled by the issuer except as provided in the standby or as consented to by the person against whom the amendment or cancellation is asserted.

**c.** Because a standby is independent, the enforceability of an issuer's obligations under a standby does not depend on:

i. the issuer's right or ability to obtain reimbursement from the applicant;

ii. the beneficiary's right to obtain payment from the applicant;

iii. a reference in the standby to any reimbursement agreement or underlying transaction; or

iv. the issuer's knowledge of performance or breach of any reimbursement agreement or underlying transaction.

**d.** Because a standby is documentary, an issuer's obligations depend on the presentation of documents and an examination of required documents on their face.

**e.** Because a standby or amendment is binding when issued, it is enforceable against an issuer whether or not the applicant authorised its issuance, the issuer received a fee, or the beneficiary received or relied on the standby or the amendment.

## 1.07 Independence of the Issuer-Beneficiary Relationship

An issuer's obligations toward the beneficiary are not affected by the issuer's rights and obligations toward the applicant under any applicable agreement, practice, or law.

## 1.08 Limits to Responsibilities

An issuer is not responsible for:

**a.** performance or breach of any underlying transaction;

**b.** accuracy, genuineness, or effect of any document presented under the standby;

**c.** action or omission of others even if the other person is chosen by the issuer or nominated person; or

**d.** observance of law or practice other than that chosen in the standby or applicable at the place of issuance.

---

## Terminology

## 1.09 Defined Terms

In addition to the meanings given in standard banking practice and applicable law, the following terms have or include the meanings indicated below:

**a. Definitions**

**"Applicant"** is a person who applies for issuance of a standby or for whose account it is issued, and includes (i) a person applying in its own name but for the account of another person or (ii) an issuer acting for its own account.

**"Beneficiary"** is a named person who is entitled to draw under a standby. See Rule 1.11(c)(ii).

**"Business Day"** means a day on which the place of business at which the relevant act is to be performed is regularly open; and **"Banking Day"** means a day on which the relevant bank is regularly open at the place at which the relevant act is to be performed.

**"Confirmer"** is a person who, upon an issuer's nomination to do so, adds to the issuer's undertaking its own undertaking to honour a standby. See Rule 1.11(c)(i).

**"Demand"** means, depending on the context, either a request to honour a standby or a document that makes such request.

**"Document"** means a draft, demand, document of title, investment security, invoice, certificate of default, or any other representation of fact, law, right, or opinion, that upon presentation (whether in a paper or electronic medium), is capable of being examined for compliance with the terms and conditions of a standby.

**"Drawing"** means, depending on the context, either a demand presented or a demand honoured.

**"Expiration Date"** means the latest day for a complying presentation provided in a standby.

**"Person"** includes a natural person, partnership, corporation, limited liability company, government agency, bank, trustee, and any other legal or commercial association or entity.

**"Presentation"** means, depending on the context, either the act of delivering documents for examination under a standby or the documents so delivered.

**"Presenter"** is a person who makes a presentation as or on behalf of a beneficiary or nominated person.

**"Signature"** includes any symbol executed or adopted by a person with a present intent to authenticate a document.

**b. Cross References**

"**Amendment**" - Rule 2.06

"**Advice**" - Rule 2.05

"**Approximately**" ("**About**" or "**Circa**") - Rule 3.08(f)

"**Assignment of Proceeds**" - Rule 6.06

"**Automatic Amendment**" - Rule 2.06(a)

"**Copy**" - Rule 4.15(d)

"**Cover Instructions**" - Rule 5.08

"**Honour**" - Rule 2.01

"**Issuer**" - Rule 2.01

"**Multiple Presentations**" - Rule 3.08(b)

"**Nominated Person**" - Rule 2.04

"**Non-documentary Conditions**" - Rule 4.11

"**Original**" - Rule 4.15(b) & (c)

"**Partial Drawing**" - Rule 3.08(a)

"**Standby**" - Rule 1.01(d)

"**Transfer**" - Rule 6.01

"**Transferee Beneficiary**" - Rule 1.11(c)(ii)

"**Transfer by Operation of Law**" - Rule 6.11

**c. Electronic Presentations**

The following terms in a standby providing for or permitting electronic presentation shall have the following meanings unless the context otherwise requires:

"**Electronic Record**" means:

i. a record (information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form);

ii. communicated by electronic means to a system for receiving, storing, re-transmitting, or otherwise processing information (data, text, images, sounds, codes, computer programs, software, databases, and the like); and

iii. capable of being authenticated and then examined for compliance with the terms and conditions of the standby.

"**Authenticate**" means to verify an electronic record by generally accepted procedure or methodology in commercial practice:

i. the identity of a sender or source, and

ii. the integrity or errors in the transmission of information content.

The criteria for assessing the integrity of information in an electronic record is whether the information has remained complete and unaltered, apart from the addition of any endorsement and any change which arises in the normal course of communication, storage, and display.

"**Electronic signature**" means letters, characters, numbers, or other symbols in electronic form, attached to or logically associated with an electronic record that are executed or adopted by a party with present intent to authenticate an electronic record.

"**Receipt**" occurs when:

i. an electronic record enters in a form capable of being processed by the information system designated in the standby, or

ii. an issuer retrieves an electronic record sent to an information system other than that designated by the issuer.

**1.10 Redundant or Otherwise Undesirable Terms**

**a.** A standby should not or need not state that it is:

i. **unconditional** or **abstract** (if it does, it signifies merely that payment under it is conditioned solely on presentation of specified documents);

ii. **absolute** (if it does, it signifies merely that it is irrevocable);

iii. **primary** (if it does, it signifies merely that it is the independent obligation of the issuer);

iv. **payable from the issuer's own funds** (if it does, it signifies merely that payment under it does

not depend on the availability of applicant funds and is made to satisfy the issuer's own independent obligation);

v. **clean** or **payable on demand** (if it does, it signifies merely that it is payable upon presentation of a written demand or other documents specified in the standby).

**b.** A standby should not use the term **"and/or"** (if it does it means either or both).

**c.** The following terms have no single accepted meaning:

i. and shall be disregarded:
**"callable"**,
**"divisible"**,
**"fractionable"**,
**"indivisible"**, and
**"transmissible"**,

ii. and shall be disregarded unless their context gives them meaning:
**"assignable"**,
**"evergreen"**,
**"reinstate"**, and
**"revolving"**.

### 1.11 Interpretation of These Rules

**a.** These Rules, are to be interpreted in the context of applicable standard practice.

**b.** In these Rules, **"standby letter of credit"** refers to the type of independent undertaking for which these Rules were intended, whereas **"standby"** refers to an undertaking subjected to these Rules.

**c.** Unless the context otherwise requires:

i. **"Issuer"** includes a **"confirmer"** as if the confirmer were a separate issuer and its confirmation were a separate standby issued for the account of the issuer;

ii. **"Beneficiary"** includes a person to whom the named beneficiary has effectively transferred drawing rights (**"transferee beneficiary"**);

iii. **"Including"** means "including but not limited to";

iv. "A **or** B" means "A or B or both"; "**either** A **or** B" means "A or B, but not both"; and "A **and** B" means "both A and B";

v. Words in the singular number include the plural, and in the plural include the singular; and

vi. Words of the neuter gender include any gender.

**d.** i. Use of the phrase **"unless a standby otherwise states"** or the like in a rule emphasizes that the text of the standby controls over the rule;

ii. Absence of such a phrase in other rules does not imply that other rules have priority over the text of the standby;

iii. Addition of the term **"expressly"** or **"clearly"** to the phrase "unless a standby otherwise states" or the like emphasizes that the rule should be excluded or modified only by wording in the standby that is specific and unambiguous; and

iv. While the effect of all of these Rules may be varied by the text of the standby, variations of the effect of some of these Rules may disqualify the standby as an independent undertaking under applicable law.

**e.** The phrase **"stated in the standby"** or the like refers to the actual text of a standby (whether as issued or effectively amended) whereas the phrase **"provided in the standby"** or the like refers to both the text of the standby and these Rules as incorporated.

# RULE 2

## OBLIGATIONS

### 2.01 Undertaking to Honour by Issuer and Any Confirmer to Beneficiary

**a.** An issuer undertakes to the beneficiary to honour a presentation that appears on its face to comply with the terms and conditions of the standby in accordance with these Rules supplemented by standard standby practice.

**b.** An issuer honours a complying presentation made to it by paying the amount demanded of it at sight, unless the standby provides for honour:

i. by acceptance of a draft drawn by the beneficiary on the issuer, in which case the issuer honours by:
(a) timely accepting the draft; and
(b) thereafter paying the holder of the draft on presentation of the accepted draft on or after its maturity.

ii. by deferred payment of a demand made by the beneficiary on the issuer, in which case the issuer honours by:
(a) timely incurring a deferred payment obligation; and
(b) thereafter paying at maturity.

iii. by negotiation, in which case the issuer honours by paying the amount demanded at sight without recourse.

**c.** An issuer acts in a timely manner if it pays at sight, accepts a draft, or undertakes a deferred payment obligation (or if it gives notice of dishonour) within the time permitted for examining the presentation and giving notice of dishonour.

**d.** i. A confirmer undertakes to honour a complying presentation made to it by paying the amount demanded of it at sight or, if the standby so states, by another method of honour consistent with the issuer's undertaking.

ii. If the confirmation permits presentation to the issuer, then the confirmer undertakes also to honour upon the issuer's wrongful dishonour by performing as if the presentation had been made to the confirmer.

iii. If the standby permits presentation to the confirmer, then the issuer undertakes also to honour upon the confirmer's wrongful dishonour by performing as if the presentation had been made to the issuer.

**e.** An issuer honours by paying in immediately available funds in the currency designated in the standby unless the standby states it is payable by:

i. payment of a monetary unit of account, in which case the undertaking is to pay in that unit of account; or

ii. delivery of other items of value, in which case the undertaking is to deliver those items.

### 2.02 Obligation of Different Branches, Agencies, or Other Offices

For the purposes of these Rules, an issuer's branch, agency, or other office acting or undertaking to act under a standby in a capacity other than as issuer is obligated in that capacity only and shall be treated as a different person.

### 2.03 Conditions to Issuance

A standby is issued when it leaves an issuer's control unless it clearly specifies that it is not then "issued" or "enforceable". Statements that a standby is not "available", "operative", "effective", or the like do not affect its irrevocable and binding nature at the time it leaves the issuer's control.

### 2.04 Nomination

**a.** A standby may nominate a person to advise, receive a presentation, effect a transfer, confirm, pay, negotiate, incur a deferred payment obligation, or accept a draft.

**b.** Nomination does not obligate the nominated person to act except to the extent that the nominated person undertakes to act.

**c.** A nominated person is not authorised to bind the person making the nomination.

### 2.05 Advice of Standby or Amendment

**a.** Unless an advice states otherwise, it signifies that:
   i. the advisor has checked the apparent authenticity of the advised message in accordance with standard letter of credit practice; and
   ii. the advice accurately reflects what has been received.

**b.** A person who is requested to advise a standby and decides not to do so should notify the requesting party.

### 2.06 When an Amendment is Authorised and Binding

**a.** If a standby expressly states that it is subject to **"automatic amendment"** by an increase or decrease in the amount available, an extension of the expiration date, or the like, the amendment is effective automatically without any further notification or consent beyond that expressly provided for in the standby. (Such an amendment may also be referred to as becoming effective **"without amendment".**)

**b.** If there is no provision for automatic amendment, an amendment binds:
   i. the issuer when it leaves the issuer's control; and
   ii. the confirmer when it leaves the confirmer's control, unless the confirmer indicates that it does not confirm the amendment.

**c.** If there is no provision for automatic amendment:
   i. the beneficiary must consent to the amendment for it to be binding;

   ii. the beneficiary's consent must be made by an express communication to the person advising the amendment unless the beneficiary presents documents which comply with the standby as amended and which would not comply with the standby prior to such amendment; and
   iii. an amendment does not require the applicant's consent to be binding on the issuer, the confirmer, or the beneficiary.

**d.** Consent to only part of an amendment is a rejection of the entire amendment.

### 2.07 Routing of Amendments

**a.** An issuer using another person to advise a standby must advise all amendments to that person.

**b.** An amendment or cancellation of a standby does not affect the issuer's obligation to a nominated person that has acted within the scope of its nomination before receipt of notice of the amendment or cancellation.

**c.** Non-extension of an automatically extendable (renewable) standby does not affect an issuer's obligation to a nominated person who has acted within the scope of its nomination before receipt of a notice of non-extension.